UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                               )
DEAN KEVIN LURIE, M.D.,                        )
                                               )
        Plaintiff,                             )
                                               )
v.                                             )        Civil Action No. 1:06CV01386
                                               )        (Civil Action No. 1:08CV1949)
MID-ATLANTIC PERMANENTE                        )        Judge Royce C. Lamberth
MEDICAL GROUP, P.C. (MAPMG)                    )
D/B/A KAISER PERMANENTE                        )
("KAISER"), ET AL.,                            )
                                               )
        Defendants.                            )
_____)

OPPOSITION TO MOTION TO STRIKE

        Plaintiff Dean Kevin Lurie, M.D. ("Plaintiff"), by and through his counsel, hereby

submits this memorandum of points and authorities in opposition to the motion to strike filed by

Defendant.

I.  NATURE OF THE CASE

        Plaintiff Dr. Lurie, a surgeon employed by Defendant Kaiser for more than 17 years, was

terminated for cause for gross misconduct for allegedly falsifying time records, when in fact he

had been following Defendant's accepted time-keeping practices.  Defendant had no legitimate

reason for terminating Plaintiff and the termination was a pretext.  Plaintiff alleges age and

pension discrimination, wrongful termination, breach of contract, and interference with his

medical practice after termination.

II.  SUMMARY

        Defendant argues without merit that Plaintiff's opposition to Defendant's statement of

material facts should be stricken because it was not concise and because it did not cite to the

1

record.  In fact, Plaintiff's statement responded to the 203 individual statements by admitting or

denying each allegation and by presenting facts with citations to the record that supported the

response.  Plaintiff attached exhibits consisting of verified pleadings, deposition transcripts,

discovery documents and affidavits.  Plaintiff's opposition complied with <u>Chambliss</u> and other

decisions of this Court as Plaintiff stated in his introduction to the opposition by responding to

each and every allegation in Defendant's statement of facts.  That it was lengty is not the test.

The test is whether it responds to the 203 statements of fact proffered by Defendant, which it did.

Defendant's own statement in opposition to Plaintiff's motion for summary judgment followed a

format similar to Plaintiff's and was also lengthy.  The parties did not object to using the same

format in their last round of motions for summary judgment that were dismissed without

prejudice, and the Court did not suggest in its order dismissing the prior motions that the

statements submitted by the parties were in any way improper.  See <u>Order</u>, September 30, 2009.

     Moreover, Defendant's committed its own irregularities.  Defendant filed an "errata" to

its own statement of facts consisting of an entirely restated statement of facts 54 days after it

filed its original statement of facts and 23 days after Plaintiff had already filed his opposition to

the original document.  Defendant also filed a reply brief to Plaintiff's opposition memorandum.

Defendant then filed a motion to strike Plaintiff's opposing statement of facts that were filed 39

days earlier.  As argued below, both the errata and the motion to strike are untimely.  The fact

that Defendant filed an errata that responded to Plaintiff's opposition and restated its statement

of facts and citations shows that there were material facts in dispute in Defendant's original

statement of facts.

     In its own opposition to Plaintiff's motion for summary judgment, Defendant regularly

cited to an affidavit of Ms. Cahill as the 30(b)(6) compliance officer of Kaiser.  That affidavit,

too, should have been stricken as it was unsupported by necessary exhibits as required under the rules.  Nonetheless, as discussed below, Plaintiff responded to Ms. Cahill's statements and raised the point that her statements were unsupported.

In sum, Defendant's Motion to Strike is inappropriate and should be denied.  Plaintiff properly responded to each of Defendant's statements of fact as provided for by the rules.

### III.  ARGUMENT

#### A.  PLAINTIFFS' MOTION TO STRIKE IS INAPPROPRIATE

##### Striking an Entire Document is an Extreme Measure and Infrequently Granted

Defendant's Motion to Strike is wholly inappropriate.  Motions to strike apply to pleadings, which Defendant's memorandum is not.  Moore's Federal Practice §12.37[2] (3d 2006).  Moreover, even with respect to pleadings, "Courts disfavor the motion to strike, because it proposes a drastic remedy." Moore's Federal Practice §12.37[1] (3d  Ed. 2006).  Under Civil Rule 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Defendant does not set forth specific statements it wishes stricken as redundant, immaterial, impertinent, or scandalous but seeks to strike the entire pleading for reasons not set forth in Civil Rule 12(f).  "[S]triking a party's pleadings is an extreme measure, and, as a result, we have previously held that [such motions] are viewed with disfavor and infrequently granted." Standbury Law Firm v. I.R.S., 221 F. 3d 1059 (8th Cir. 2000). "Courts disfavor the motion to strike, because it proposes a drastic remedy.'" Moore's Federal Practice §12.37[1] (3d 2006).

Although the document that Defendant seeks to strike is not a pleading, a court has discretion to strike a document to enforce local rules.  "The Court may choose to strike a filing

that is not allowed by local rule, such as a surreply filed without leave of Court."  McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP, 2008 U.S. Dist. LEXIS 47805 (D.D.C. 2008).  The Court disfavors striking an opposition that would be an extreme action that could render Defendant's statement of facts conceded.  "[T]he court has cautioned, in view of the severity of dismissal of a potentially meritorious claim, that treating an issue as conceded for failure to respond fully to a motion for summary judgment 'should only be applied to egregious conduct.'"  Quality Air Services, LLC v. Milwaukee Valve Company, Inc., 671 F. Supp. 2d 36, 40 (D.D.C. 2009), citing Burke v. Gould, 286 F. 3d 513, 518 (D.C. Cir. 2002).

The Motion to Strike is Untimely and Prejudicial

 Defendant's Motion to Strike is untimely.  Although there is no rule that appears to speak directly to the timing of the motion, Rule 12(f) is persuasive.

Under Rule 12(f) a motion to strike a pleading may be made either (i) before responding to the pleading or, (ii) if a response is not allowed, within 21 days after being served with the pleading.  Fed. R. Civ. Pro. 12(f) (12/1/2009).  Under the first part of Rule 12(f),Defendant's Motion to Strike was untimely because Defendant had already responded to Plaintiff's opposition by filing an "errata" to its statement of facts.  The errata restated and corrected Defendant's entire document and accepted the comments raised by Plaintiff in his opposition.  Defendant filed the errata on March 24, 2010, 23 days after Plaintiff had already filed his opposition.  Plaintiff, rather than filing its own motion to strike for an untimely "errata," treated the document as a reply called by another name.

By filing a reply to Plaintiff's opposition (albeit mischaracterized as an "errata" or "corrected Local Rule 7(h) statement"), Defendant's Motion to Strike was untimely under Rule 12(f) because Defendant had already responded.  Additionally, Defendant filed the motion to

4

strike <u>after</u> it had already filed a reply brief in addition to the errata. Defendant filed its reply

brief on April 6, 2010, and filed its motion to strike on April 9, 2010, three days later. Thus, the

Motion to Strike was untimely because Defendant filed it after it had already replied to

Plaintiff's opposition.

Defendant's Motion to Strike was also untimely under the second part of Rule 12(f),

because it was filed more than 21 days after Plaintiff had filed its opposition. Even if Defendant

were held not to have responded, as stated in the first part of Rule 12(f), the Motion to Strike was

filed 39 days after Plaintiff had already filed its opposition, and well beyond the 21 days allowed

for filing motions to strike pleadings. Thus, under either part of Rule 12(f) the Motion to Strike

was untimely.

The principle of Rule 12(f) applies here. Rule 12(f) seeks to avoid prejudice by

preventing a party from benefitting from its own statement of facts after responding to the non-

moving party's opposition, and then striking the non-moving party's opposition so that the

moving party's statement of facts would be conceded. The rule also requires a party to move to

strike within a reasonable time after the document that is objected to is filed. Here, Defendant

waited too long to object. The parties had already filed replies to both motions for summary

judgment.

<u>The "Errata" is Also Untimely</u>

The errata was also untimely. Normally, errata are filed within a day or two of the

original pleading. Generally, errata are filed to correct an error in the original document.

Defendant's errata was filed 54 days after its original pleading. The errata restated the entire

document. There is simply no way that a document filed nearly two months after the original

document can be characterized as an "errata," particularly since it was filed <u>after</u> Plaintiff had

5

already filed his opposition to the original document and it responded to issues raised by

Plaintiff's opposition, including incorrect citations to the record.  The fact that Defendant filed

an errata that responded to Plaintiff's opposition shows that Defendant's statement contained

material facts in dispute.  As noted above, Plaintiff treated the document as a reply, which is the

only proper way to characterize a document filed after an opposition has been filed.   To treat the

errata as other than a reply would prejudice Plaintiff, because Plaintiff had already responded to

the originally filed document 23 days earlier.

### B.  <u>PLAINTIFF'S FORMAT WAS  PERMISSIBLE UNDER THE RULES</u>

Under Rule 56, a party claiming relief, or a party against whom relief is sought, may

move, with or without supporting affidavits, for summary judgment on all or part of the claim.

The judgment sought should be rendered if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(a), (b) and (c)

(12/1/2009).

Under Local Rule 7(h)(1), "[e]ach motion for summary judgment shall be accompanied

by a statement of material facts as to which the moving party contends there is no genuine issue,

which shall include references to the parts of the record relied on to support the statement.  An

opposition to such a motion shall be accompanied by a separate concise statement of genuine

issues setting forth all material facts as to which it is contended there exists a genuine issue

necessary to be litigated, which shall include references to the parts of the record relied on to

support the statement."  The document is also to be accompanied by a memorandum of points

and authorities and proposed order under Local Rules 7(a), (b) and (c).  LCvR 7 (9/2/2008).

Plaintiff stated in his introduction to "Plaintiff's Statement of Material Facts as to

Which Plaintiff Contends There Are Genuine Issues" under Fed. R. Civ. Pro. 56 and LCvR 7(h)(1) that:

> "Plaintiff hereby responds to each of the 203 specific statements contained in Defendant's Local Rule 7(h) Statement ("DSMF") as to which Defendant contends there is no material issue of fact.  Although lengthy, Plaintiff is following the procedure set forth in <u>Chambliss v. National Railroad Passenger Corporation</u>, 2007 U.S. Dist. LEXIS 11522 (2007) by responding to each statement in corresponding numbered paragraphs and supporting each response through citations to the record.  See also, <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F. 3d 145 (D.C. Cir. 1996)."

"Plaintiff's Statement of Material Facts as to Which Plaintiff Contends There Are Genuine Issues," filed 3/1/2010 at 1 (Document 72-1).

The same format was used by both Plaintiff and by Defendant in their oppositions to the motions for summary judgment filed recently and in the oppositions to the motions for summary judgment that were filed last year and dismissed without prejudice.  The format responded to each allegation in the proponent's statement of facts in corresponding numbered paragraphs and supported each response through citations to the record.  Plaintiff's opposition complied with <u>Chambliss</u> and other decisions of this Court as Plaintiff stated in his introduction to the opposition by responding to each and every allegation in Defendant's statement of facts.

That Plaintiff's opposition was lengthy is not the test; the test is whether it was responsive to Defendant's 203 requests, which Plaintiff's opposition was.  Although the Court dismissed the summary judgment motions filed last year without prejudice so that Defendant would produce documents in response to Plaintiff's motion to compel, the Court did not suggest in any way that the format used by the parties was improper.  See <u>Order</u>, September 30, 2009.

7

In <u>Chambliss v. National Railroad Passenger Corporation,</u> 2007 U.S. Dist. LEXIS 11522 (2007), the party responding to the motion for summary judgment failed to file a statement of facts that responded to each of the statements of fact proffered by the moving party. Instead, the responding party submitted its own statement of facts. The Court objected to the manner of responding and ordered the responding party to file another response. Unlike <u>Chambliss,</u> Plaintiff here responded to each of the 203 specific statements contained in Defendant's statement by admitting or denying each allegation and by presenting facts with citations to the record that supported the response, which is what was required in <u>Chambliss</u>. In <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,</u> 101 F. 3d. 145 (D.C. Cir. 1996) the proponent of the statement of facts had failed to cite to the record, which is not the case here. The cases place the burden on the parties to go through the thousands of pages of discovery documents and inform the Court whether material facts are in dispute. Plaintiff examined each of Defendant's 203 allegations and responded to each of them, thereby showing that there are material facts in dispute and that Defendant's motion for summary judgment should be denied.

This is not a case where Plaintiff failed to file an opposing statement of facts as a separate document, respond to numbered paragraphs, cite to the record, or submit exhibits. [1] Even in those cases where the non-moving party has failed in one or more of these respects, courts have taken different positions as to whether to strike an opposition and treat the statement of facts filed by the moving party as conceded. Compare <u>Chambliss v. National Railroad</u>

---

[1]   Defendant also cites to <u>Isse v. American University</u>, 540 F. Supp. 2d 9 (D.D.C. 2008) and <u>Valles-Hall v. Center for Nonprofit Advancement</u>, 481 F. Supp. 2d 118 (D.D.C. 2007). The cases refer to oppositions that did not cite to the record. In <u>Valles-Hall</u> the responsive statement also did not respond to the numbered paragraphs in the moving party's statement of facts. Neither is the case here.

Passenger Corporation, 2007 U.S. Dist. LEXIS 11522 (D.D.C. 2007) [the Court treated the moving party's statement of facts as conceded after the non-moving party failed to re-file a separate statement of facts that responded to numbered paragraphs after being ordered to do so] with Quality Air Services, LLC v. Milwaukee Valve Company, Inc., 671 F. Supp. 2d 36, 40 (D.D.C. 2009) [the Court found that the non-moving party's brief contained "extensive citations to various exhibits and deposition testimony" that were not contained in the statement and did not strike the opposition.]

As an example, Plaintiff's response to Defendant's request #101, although lengthy, responds directly to Defendant's request by denying the allegation, stating that the statement of fact is in dispute and erroneous, and that Plaintiff's testimony was mischaracterized.  Plaintiff's response presented facts, with citations and quotes to the record, that support his response:

> "101.   DSMF 101: Dr. Lurie has identified only one other surgeon, Dr. Krolick, out of the thirty surgeons in MAPMG, who ever created a ghost clinic. (Deposition of Dr. Lurie (10/6/08) 288:10-21).
>
> Plaintiff Response: Deny. This statement is in dispute. This is a mis-characterization of Dr. Lurie's testimony. Dr. Lurie was asked, "Do you know of any surgeons outside of Largo Medical Center who billed that way?" Dr. Lurie states, "No. I don't."  He doesn't state that MAPMG has thirty surgeons. (Deposition of Dr. Lurie (10/6/08) 287-288, Plaintiff's Exhibit 10.)
>
> This statement is also erroneous. Dr. Lurie has stated that both Dr. Cohen and Dr. McCanty billed in this way, and they testified to that fact.
>
> Q.   What other physicians at the Largo center do you know who were billing an extra session if they had more than two double books in a session?
>
> A.   Well we've heard Miss Cahill say that Sonya Krolik did that in the department of surgery. And we've heard Sonya Krolik say that she did that in the department of the surgery. And we've heard Tim McCanty say that he did that in the department of urology. And we've heard John Cohen say that he did that in the department of orthopedics. In conversations with Roy Joseph, he has told me that he has billed that way. In conversations with Lac William, L-A-C, Vetter, V-E-T-T-E-R he has told me that he billed that way. He has told me that Maurice Cates had a variation

of that where he would see one patient in an evening spot and then not see anybody else. I think you called that bunching in a previous memo. Those are the people that I've heard with my ears that told me that they bill that way.

(Deposition of Dr. Lurie (10/6/08) 287-288, Plaintiff's Exhibit 10.)

The method used to investigate ghosts or evening clinics did not detect or identify those who might have billed in this way, but did not work more than 90 hours, which was Cahill and Holsteen's cut-off point.  In other words, they did not investigate those who worked less hours and maintained time-records like Dr. Lurie.

Dr. Cohen and Dr. McCanty testify in their deposition they had evening clinics.

Dr. Cohen states that the payroll system wasn't sophisticated enough to pay for productivity, so this was the method used to pay for excess productivity.

A.  I'd call that over-booking or just a very antiquated way for productivity. To say, okay, Doctor, you were supposed to see 16 people today, but you saw 22, and we're going to pay you a little extra. Thanks for seeing the extra patients. That's how we handled them in orthopedics.

Q.  And what was the mechanism for reporting these extra patients on your –

A.  The mechanism – the administrative staff would check with the clinic administrator and if he or she approved it, we would addition it to our time card at the end of the day. So let's say I'm filling out my time card and Monday was extremely heavy clinic, I saw a lot of patients, even though I finished at 5:00 and instead of seeing 15 or 16 people I saw 22 people. I would add an extra hour on or two hours on for the clinic day in my own handwriting. And they would have called whoever did the billing out of position payment and they would have approved it. That's how we handled it. I don't consider that ghost. The patients were seen, but they had no sophisticated system to deal with productivity.

Q.  Okay. And who came up with this method of receiving extra compensation for seeing additional patients?

A.  I have no idea. It was part of the regime when I arrived. I was told this is how it's done.

Q.  And who is that told you?

A.  Well, I guess it would be Dr. Cates. He was the director – he was in charge of orthopedics at the time…

(Deposition of Cohen (5/21/08) 19-21, Plaintiff's Exhibit 7.)

10

Dr. Cohen also states that this was standard operating procedure:

Q.      Do you know if other doctors received pay for seeing extra patients in the same way?

A.      It was very common in orthopedics. This was standard SOP. This is what you do. Boy, you really worked hard today, tack on a couple of hours to your clinic and we'll pay you extra."

(Deposition of Cohen (5/21/08) 22, Plaintiff's Exhibit 7.)

Dr. McCanty states that he also had extra clinics:

A.      Well, the contract that MAPMG had at that time with the health plan – the Kaiser Foundation health plan – didn't allow the doctors to see more than two double-books per session. So that was – contractually, we were – the physicians, at least in the urology department, were only obliged to see what was on the schedule, plus two double-books per session. Beyond that, we were entitled to additional compensation...

Q.      And was that described? How was that contract described to you, again? It was a contact between MAPMG?

A.      Correct.

Q.      And Kaiser Health Plan?

A.      Yes.

Q.      And there was supposedly some provision in that agreement that limited the number of double-books –

A.      That's my understanding. Yes.

Q.      But, obviously, the physicians in your department were seeing more than two patients in one slot?

A.      Occasionally, yes.

Q.      And the way to get around that was to create a separate session, so that on paper it appeared that these individuals were coming in the evening?

A.      Correct.

Q.      When actually there were coming in during the day and you were seeing them as

11

> a third patients?
>
> A.    That's correct.
>
> Q.    And why did you receive compensation for that third patients? Why wasn't that just part of your normal duties? Saw one patient, saw two patients as double-booked, see a third patient as a triple-book? Why would you be compensated separately for the third patients?
>
> A.    Because the – I'm going to call it contracted, although, as I said before, this I not your typical contact – the understanding between MAPMG and the health plan, which I'd call a contract, limited the amount of patient that physicians were obliged to see on a daily basis. If that limit was exceeded, there had to be some extra compensation for the doctor that actually saw the patient.
>
> Q.    Now, would that compensation be overtime?
>
> A.    I think that's what they called it, yes.
>
> (Deposition of McCanty (5/21/08) 22-24, Plaintiff's Exhibit 12.)"

Defendant, too, responded in much the same way in opposition to Plaintiff's statement of material facts in support of its own motion for summary judgment. Defendant's response, like Plaintiff's response, included argument which is necessary to show why the statement could not be admitted. What Defendant calls argument is, in fact, the reason why the allegation could not be admitted without qualification.

Defendant also produced lengthy responses. Defendant's response to Plaintiff's SMF 19 was two and one-half pages long, contained verbatim citations to Ms. Cahill's deposition, and was argumentative.

> "19.  SMF 19: Plaintiff Dr. Lurie was terminated for cause for gross misconduct for falsification of time records. (Defendant's Response to Request for Admissions (1/4/2008) ¶ 3, Exhibit 5; Deposition of Ann Cahill (9/29/2008) 155-157, Exhibit 8; Statement of Terminated Physicians, Exhibit 6; Maryland Office of Unemployment Insurance Decision (12/14/2005), Exhibit 19; EEOC Complaint (2/26/2006), Exhibit 17.) This was the only reason he was terminated:
>
> Q.    Now, inter alia means, as I said, means other things.  Was there any other reason why he [Plaintiff Dr. Lurie] was terminated?

12

A.    No.

(Deposition of Ann Cahill (9/29/2008) 156, Exhibit 8; Defendant's Response to Interrogatory No. 2, Exhibit 4.)

<u>Defendant's Response:</u> Admitted that the immediate cause for Dr. Lurie's termination was his gross misconduct in falsifying time records. Denied that this is the only reason he was terminated. MAPMG considered Dr. Lurie's long disciplinary history in deciding to terminate his employment. Dr. Lurie takes Ms. Cahill's testimony out of context. In answer to an interrogatory, MAPMG stated that Dr. Lurie was "terminated for *inter alia*, submitting time sheets seeking additional pay..." Dr. Lurie conveniently ignores the following testimony by Ms. Cahill in response to a question about that interrogatory answer:

Q:    Do you know what the term *inter alia* means?

A:    I don't remember.

Q:    Okay. It's a legal term and it means among other things. Your testimony earlier today I recall that this was the only reason he was terminated and I wanted to ask you if, in fact, this is the only reason he was terminated?

A:    I don't remember saying it was the only reason. *I know that also in consideration was the behavior of Dr. Lurie on previous occasions. Concerns about him were mitigating factors.*

Q:    Well, you haven't mentioned that until now in this deposition, or in this case, that there were other considerations for his termination so I am going to ask you what are those considerations?

*A:    I think there was a concern about how Kevin responded to issues; his behaviors towards colleagues, towards patients or patient families, to places - to people in places where Kaiser Permanente does business; for instance, Washington Hospital Center.*

(Cahill Depo., Exhibit 5, at 150:22-151:22) (emphasis added). Ignoring that testimony,

Dr. Lurie cites only Ms. Cahill's testimony just moments later after being asked a series of questions relating to his *termination letter*. Ms. Cahill was asked if the *termination letter* mentioned his behavior aside from the improper billing. In that context, she testified:

Q:    Did you give Dr. Lurie a termination letter?

A:    Did I? No.

13

Q:      Did anybody in the Kaiser organization give him a termination letter?

A:      Yes.

Q:      He was terminated for cause?

A:      He was terminated for cause?

Q:      What was the cause stated to be?

A:      I believe it was for the inappropriate coding of his time sheet - put on - the timing put on -

Q:      There was no mention of his behavior issue?

A:      I don't believe that was on the termination letter.

Q:      Now, *inter alia*, means, as I said, means other things. Was there any other reason why he was terminated?

A:      No.

(Cahill Depo., Exhibit 5, at 155:15-156:11).

Dr. Lurie takes this testimony out of context by failing to cite the preceding line of questions concerning the termination letter, and he entirely fails to mention Ms. Cahill's earlier testimony that in deciding to terminate his employment MAPMG considered his behavior towards colleagues, patients, patient families and people in places where Kaiser Permanente does business, like Washington Hospital Center."

Defendant's articulated reason for terminating Dr. Lurie is not in dispute despite Defendant's lengthy opposition.  Dr. Lurie was terminated for gross misconduct for allegedly falsifying his time sheets.  Defendant's attempt to add behavior as an additional reason is an attempt to buttress its case after the fact.  Defendant's response admits Plaintiff's statement and spins Ms. Cahill's testimony to add behavior an additional reason when it was not.  Neither the evaluation received by Dr. Lurie before he was terminated, the evidence presented to the Maryland Office of Unemployment Insurance, or Defendant's statement of terminated physicians, cite behavior as a reason for his termination.  (See Plaintiff's Reply to SMF 19

14

(Document 79-1).)  Plaintiff argues in his briefs that the reason given, namely, gross misconduct for falsifying time sheets, was false and a lie.

Unlike Plaintiff, Defendant refused to directly respond to many of Plaintiff's proffers and gave nuanced answers that avoided the proffer entirely.  Plaintiff identified 14 of 106 answers that were non-responsive or nuanced, and Plaintiff noted in his reply where Defendant was deficient.  (See SMF 6, 15, 16, 34, 41, 53, 68, 76, 77, 86, 88, 90, 96, and 102 to Plaintiff's Reply in Support of Plaintiff's Statement of Material Facts As To Which Plaintiff Contends There Is No Genuine Issue, Document 79-1, filed 4/9/2010.)  As an example, Defendant's response to SMF 15 admits to Plaintiff's statement.  But, the rest of Defendant's answer is non-responsive. Dr. Manning's evaluation does not reference any problems with time sheets, and reports that Dr. Lurie demonstrated improvement in behavior issues. Defendant gave blanket denials to SMF 61, 62, 63, 64, 65 and 73, referencing responses to other denials, even though the facts requested to be admitted were different.

Defendant also inserted unrelated facts, unsupported information and argument.  (See SMF 6, 9, 10, 11, 14, 19, 26, 28, 29, 30, 35, 41, 42, 43, 50, 57, 58, 65, 67, 70, 74, 77, 88, 89, 90, 92, and 101.)  For example, Defendant was asked to admit that Dr. Lurie was privileged and practicing at Washington Hospital Center (WHC) in the District of Columbia in 2001, and continued to retain privileges while at Kaiser.  Defendant admitted the statement and then qualified its response to say that Dr. Lurie was barred from working with the hospital's residents, contradicting letters from WHC and Kaiser that accorded him full privileges.  (See Plaintiff's Reply to SMF 6, Document 79-1, filed 4/9/2010, and Plaintiff's Reply Exhibit 11.)

Plaintiff admits or admits in part to roughly 35% of the Defendant's SMF's.  Plaintiff provides reasons for its denials or denials in part with citations to the record.  Defendant admits or admits in part to roughly 61% of Plaintiff's SMF's.

Defendant argues that Plaintiff improperly based many denials on alleged unspecified deficiencies in the affidavit of Ms. Cahill as the 30(b)(6) compliance officer of Kaiser.  (Aff. of Ms. Cahill (2/26/2010)).  Defendant's Memorandum to Motion to Strike at 5.  On the contrary, Plaintiff disputed Ms. Cahill's  allegations in his own affidavits and questioned Ms. Cahill's compilation of data to raise a material issue of fact.  (See Lurie Aff. (1/27/10) and Lurie Aff. (2/28/10), Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit #2, Docket #72-2, filed 3/1/2010.)  Ms. Cahill's statements are contradictory and unreliable. Plaintiff rebuts them in Plaintiff's filings through verified pleadings, deposition transcripts and affidavits.

Ms. Cahill's affidavit should have been stricken as it was unsupported by necessary exhibits as required under the rules.  Under Rule 56(e) a supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  The rule also states that "If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  Fed. R. Civ. Pro. 56(e) (12/1/2009).  Although as a designated 30(b)(6) witness Ms. Cahill may testify about "information known or reasonably available to the organization," there is no excuse for failing to produce supporting documents.  Much of Ms. Cahill's testimony is inadmissible hearsay.  Ms. Cahill had access to supporting documents, and they should have been provided.  Consequently, without seeing the material upon which Ms. Cahill relies for her statements it is not possible to properly respond to her affidavit.

16

As examples:

o    Ms. Cahill states that she "examined the time records of every physician in the

      Medical Group's General Surgery department whose timesheets reflected over 90

      hours during any pay period in 2005." Cahill Aff. (3/1/2010) at ¶ 10. Many of

      these documents were not produced in discovery, and Ms. Cahill does not attach

      them to her affidavit as required by Rule 56(e). No report of the investigation by

      Ms. Cahill or Ms. Holsteen was produced and Defendant admits one did not exist.

      (SMF 105 to Defendant's Opposing Statement of Material Facts as to Which

      Defendant Claims There Is A Genuine Issue, Document 71-1, filed 3/1/2010).


o    Dr. Lurie identified other physicians who billed for extra sessions, that

      contradict's Ms. Cahill's affidavit, including Drs. McCanty, Cohen, Joseph and

      Vetter. (SMF 101 to Plaintiff's Statement of Material Facts as to Which Plaintiff

      Contends There are Genuine Issues, Document 72-1, filed 3/1/2010.) Depositions

      of Drs. Lurie, McCanty and Cohen were attached. (Plaintiff's Exhibits 10, 12, and

      7.) Attached to Plaintiff's Reply in support of his Motion for Summary Judgment

      on the Counterclaim are time sheets for Drs. Vetter and Brems that show "extra"

      sessions, many of which were for pay periods under 90 hours. (Plaintiff's Reply

      Exhibit 13, filed 4/9/2010.) Drs. Vetter and Cohen were in orthopedics, and Dr.

      Vetter was on the Board of Directors. Drs. Brems and McCanty were in urology,

      and Dr. Brems was chief of urology.

o   Ms. Cahill states that she directed Ms. Holsteen to examine the schedules for the

entire Medical Group during 2004 and 2005.  "Ms. Holsteen reported to [her] that

she saw no evidence that any physicians other than Drs. Lurie and Krolick had

engaged in that practice [the practice of creating "ghost clinics"].  Cahill Aff.

3/1/2010 at ¶ 10.  Besides Ms. Cahill testifying to hearsay comments of Ms.

Holsteen, the schedules referenced by Ms. Cahill were not attached to Ms.

Cahill's affidavit as required by Rule 56(e).

o   Ms. Cahill reports that she obtained information from Plaintiff's supervisor Dr.

Manning that is reflected on the "second page of the 2005 document."  She stated

that it does not reflect any knowledge on the part of MAPMG that physicians

were engaging in the practice of billing additional hours for patients seen during

their normal eight-hour work day.  In addition to being hearsay, she does not

attach what she obtained from Dr. Manning.  Nor, for that matter, does she attach

information from any other service chief who supplied information for the 2005

Pay Practices Document.  Dr. Lurie disputes her statements in his affidavit.  Lurie

Aff. (2/28/2010).  Dr. Manning stated that compensation for billing during the

day was permitted.  (SMF 74 to Plaintiff's Reply in support of his Motion for

Summary Judgment on the Counterclaim.)

o   Dr. Lurie states that he reviewed the statistics provided by Ms. Cahill in discovery

and they are not verifiable.  In one set of data concerning terminated surgeons in

his own Department of General Surgery, he notes that four surgeons out of thirty,

namely, Dr. Laurence Bachman, Dr. Jacqueline Thompson, Dr. Albert Role, and

Dr. Clarke, each of whom worked in the DC/Maryland Department of Surgery

were omitted from the data amounting to 13% of the physicians in his

department, and an error rate of 13%.  (Aff. of Dean Kevin Lurie, M.D.

(2/28/2010) ¶ 7.)

Plaintiff did not have the benefit of key documents, to which Ms. Cahill refers in her

affidavit, in time for Ms. Cahill's 2008 depositions.  Defendant's policies and procedures, for

example, were not produced until after the Court ordered them produced in the Fall of 2009 in

response to Plaintiff's motion to compel.  They were requested by Plaintiff's Document Request

#30.  The Court ordered Defendant to produce policies and procedures responsive to Plaintiff's

request for production #30.  Order, September 30, 2009.  Plaintiff also did not have the benefit of

the 2005 Pay Practices document prepared by Ms. Cahill.  The document was produced in

discovery as a blank document and marked "Intentionally Left Blank."  It was not disclosed until

January 7, 2010, in response to the Court's Order compelling documents, and, thus, was not

available for Ms. Cahill's deposition.  (See Plaintiff's Reply Memorandum of Points and

Authorities in Support of Plaintiff's Motion for Summary Judgment on the Counterclaim, at 2.)

Defendant takes a narrow view of the order compelling the production of documents and argues

that the 2005 Pay Practices document was not a policy and procedure because it was not ratified

by the Board of Directors.  Nonetheless, Defendant has a continuing obligation to respond to

Plaintiff's discovery up until trial.  Certainly, if Defendant wishes to rely on the document, it

needed to be produced.  Even if not a policy and procedure, the 2005 Pay Practices document

was prepared by Ms. Cahill for Dr. Carney and falls within Plaintiff's Document Request #31 that was served on November 1, 2007.

Defendant argues that it should not be burdened with responding to each of Plaintiff's oppositions to Defendant's 203 statements of fact.  Defendant's Motion at 1.  On the contrary, the burden is on the parties and their counsel to crystallize for the district court the material facts and relevant portions of the record.  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F. 3d 145, 151 (D.C. Cir. 1996).  Time was not an issue as the parties had cooperated in granting additional time to respond.  Defendant also says that the page limitations applicable to the reply brief did not allow it to respond.  If page limitations were an issue for its reply brief, Defendant could have petitioned the Court to enlarge the page limitations for its reply brief under LCvR 7(e).

Defendant was not prevented from filing a reply statement of facts to the opposition statement of facts that would not have been subject to page limitations.  A reply statement of facts is not prohibited by the rules.  See McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP, 2008 U.S. Dist. LEXIS 47805 (D.D.C. 2008) ["As to the Reply Statement, however, the Court does not find any violation of the Local Rules that would justify its striking."]  Indeed, Plaintiff filed a reply statement of facts in support of his own motion for summary judgment on the counterclaim.  (Document 72-1).

What Defendant neglects to mention is that it filed an "errata" consisting of a restated statement of facts that responds to issues raised by Plaintiff's opposition and that was not subject to page limitations.  Although Defendant calls its filing an "errata," the timing of the Defendant's filing – 54 days after Defendant filed its original statement of facts and 23 days after Plaintiff filed his opposition – suggests that it was, in fact, a reply.  Defendant obviously

20

had time to "sift" through Plaintiff's opposition to prepare its "errata" that amended and restated its statement of facts.  In any event, Plaintiff treated the document as a reply.  Otherwise, Plaintiff would be prejudiced by having already responded to the original statement of facts. Defendant's own 203 submissions were voluminous and required a response to each proffer, necessitating the response filed by Plaintiff.

IV.  <u>CONCLUSION</u>

Defendant's Motion to Strike is just another attempt by Defendant to reargue its case, constituting an additional reply without leave of Court or agreement of counsel.  Defendant's motion lacks merit.  Plaintiff's opposition cited to the record and included references to verified pleadings, deposition transcripts, documents and affidavits.  Plaintiff's opposition shows that there <u>are</u> material facts in dispute.  Defendant's own "errata" responded to Plaintiff's opposition and adopted many of Plaintiff's opposing comments, thereby admitting that Defendant's own statement contained material facts in dispute.  Because there are material facts in dispute, Defendant's motion for summary judgment should be denied.  Because Defendant's motion is without merit, Plaintiff respectfully requests costs and attorney's fees for filing this opposition.

WHEREFORE, for the foregoing reasons, Plaintiff prays that Defendant's motion be denied.

Dated: April 23, 2010.

21

Respectfully submitted,

DEAN KEVIN LURIE, M.D.
("Plaintiff")


By:_____/s/_____
       James S. Bubar, Esq.
       (D.C. Bar No. 321125)
       Suite 800
       1776 K Street, N.W.
       Washington, DC  20006
       (202) 223-2060
       (202) 223-2061 Fax
       JBubar@aol.com Email

       Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2010, the service of the foregoing "Opposition,"and proposed order under Fed. R. Civ. P. 5(a) has been made under Local Civil Rule 5.4(d) on the following person:

       Charles R. Bacharach
       Gordon, Feinblatt, Rothman,
       Hoffberger & Hollander. LLC
       233 East Redwood Street
       Baltimore, MD 21202
       (Counsel for Defendants)


       _____/s/_____
       James S. Bubar

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
DEAN KEVIN LURIE, M.D.,                 )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )       Civil Action No. 1:06CV01386
                                        )       (Civil Action No. 1:08CV1949)
MID-ATLANTIC PERMANENTE                 )       Judge Royce C. Lamberth
MEDICAL GROUP, P.C. (MAPMG)             )
D/B/A KAISER PERMANENTE                 )
("KAISER"), ET AL.,                     )
                                        )
        Defendants.                     )
_____ )

<u>ORDER</u>

Upon consideration of the Motion to Strike ("Motion") filed by Defendant, and the

opposition thereto filed by Plaintiff, it is this _____ day of _____, 2010:

ORDERED, that the Motion be and hereby is DENIED.


        _____
        UNITED STATES DISTRICT JUDGE

CC:     James S. Bubar, Esq.
        1776 K Street, N.W., Suite 800
        Washington, DC  20006
        (Counsel for Plaintiff)

        Charles R. Bacharach, Esq.
        Gordon, Feinblatt, Rothman,
        Hoffberger & Hollander. LLC
        233 East Redwood Street
        Baltimore, MD 21202
        (Counsel for Defendants)