**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
**DEAN KEVIN LURIE, M.D.**     )
     )
    **Plaintiff,**     )
     )
     )  **Civil Action No. 06-01386 (RCL)**
    **v.**     )
     )
**MID-ATLANTIC PERMANENTE**     )
**MEDICAL GROUP, P.C.**     )
    **Defendant.**     )
_____)

**<u>MEMORANDUM OPINION</u>**

**I.**    **Introduction**

The case concerns an employment dispute between plaintiff Dr. Dean Kevin Lurie, a surgeon, and his former employer defendant Mid-Atlantic Permanente Medical Group. After many years of working for defendant, plaintiff was terminated for allegedly falsifying his time sheets and his history of disciplinary problems, reasons plaintiff claims are a mere pretext for disposing of an old employee who challenged unprofessional conduct at his workplace. In addition to a number of common law claims for breach of contract, tortious interference, and wrongful discharge, plaintiff alleges violations of the Age Discrimination in Employment Act (ADEA) and the Employee Retirement Income Security Act (ERISA). Defendant filed a counterclaim seeking recovery for breach of contract, fraud, negligent misrepresentation, and unjust enrichment. Currently, before the Court are defendant's motion [78] to strike plaintiff's statement of material fact, defendant's motion [68] for summary judgment and plaintiff's motion [69] for summary judgment on the counterclaim. Based on the following considerations, the Court will DENY defendant's motion to strike and GRANT defendant's motion for summary

judgment. The Court does not reach plaintiff's motion for summary judgment, because the Court lacks jurisdiction over defendant's counterclaim. Therefore, the Court will DISMISS defendant's counterclaim on jurisdictional grounds.

## II.    Factual Background

Plaintiff is a vascular surgeon residing in the District of Columbia. (Pl.'s Verified Compl. [72-3] ¶ 5.) Defendant is a professional corporation with its principal place of business in Maryland that employs physicians who provide medical services to members of the Kaiser Foundation Health Plan of the Mid-Atlantic States. (*Id.* ¶ 6; Cahill Aff. [68-3] ¶ 3.) Plaintiff's employment with defendant began in 1998. In addition to substantive terms of employment, plaintiff's job offer letter included a provision mandating that plaintiff abide by defendant's "policies, rules and regulations." (Pl.'s Ex. 2 [69-4] at 2.) Plaintiff signed the letter and commenced working for defendant as a surgeon in the District of Columbia and its Maryland suburbs. (*Id.* at 3; Cahill Aff. [68-3] ¶ 5.)

As part of his duties with defendant, plaintiff was assigned to treat patients at various local hospitals.[1] (Lurie Dep. [68-4] at 67:13.) While working at the Washington Hospital Center (WHC), plaintiff came into conflict with his colleagues over concerns about safety and quality of care. (*Id.* at 107:18–108:13, 115:13–116:21.) When he raised his concerns with his superiors, he received some hostile responses. (Def.'s Ex. 3 [68-5] at 2–3; Def.'s Ex. 5 [68-7] at 2.)

Citing plaintiff's troubled relations with the surgical residents, the head of surgery requested and obtained plaintiff's reassignment in 2001. (Def.'s Ex. 4 [68-6] at 2; Lurie Dep. [68-4] at 83:7–11.) Official admonitions from defendant followed, and when plaintiff was

---

[1] Although defendant maintained outpatient clinics like the Largo Medical Center, it also needed to be able to see patients at hospitals. (*See* Lurie Dep. at 54:8–15.) Consequently, its physicians were assigned to independent, partner hospitals like the Washington Hospital Center where they could treat Kaiser patients. (*See* Lurie Dep. [68-4] at 52:3–54:21.)

reassigned to WHC two years later, the head of surgery complained about his behavior once again. (Def.'s Ex. 5 [68-7] at 2; Lurie Dep. [68-4] at 102:1–13; Def.'s Ex. 6 [68-8] at 3.) In late 2003, plaintiff was suspended with pay and an investigation was conducted of his conduct. (Lurie Dep. [68-4] 152:11–153:12.)

Not long after this last round of disciplinary action, plaintiff was transferred to defendant's Largo, Maryland medical center. (Lurie Dep. [68-4] at 118:15–120:10.) When plaintiff first arrived, he felt pressured to see many double-booked patients. (*Id.* at 300:7–10.) Plaintiff's colleagues told him that, at the Largo Center, these extra patients were handled by establishing evening clinics or ghost clinics. (*Id.* at 300:10–15.) The phrase "ghost clinic" is defendant's terminology for a billing method utilized by certain physicians employed by defendant. (Mem. in Supp. of Def.'s Mot. for Summ. J. [68-2] at 5.) Physicians who had many sessions double booked during the day would include hand-written addendums with their time sheets that specified hours worked during the evening. (Lurie Dep. [68-4] at 284:16–286:12, 300:4–18, 301:15–302:6.) Physicians could thereby be compensated for the extra patients seen during regular hours. (*Id.* at 302:4–12.) In reality, no patients were actually treated in the evening, thus the expression, ghost clinic. (*Id.* at 289:5–290:8.)

Defendant was not alone in making use of ghost clinics. Dr. Cohen, an orthopedist, and Dr. McCanty, a urologist, billed for double-books in the same manner as plaintiff. (Cohen Dep. [72–9] at 18:12–19:14; McCanty Dep. [72-14] at 25:5–21.) Additionally, Dr. Krolik, a surgeon who worked with plaintiff, established ghost clinics on three occasions in 2004. (Cahill Aff. [68-3] ¶ 14.) None of these physicians were subject to disciplinary action as a result of their billing practices. (Pl.'s Opp'n [72] at 16.) Although plaintiff followed the example and advice of his fellow doctors in creating ghost clinics, (Lurie Dep. [68-4] at 300:4–301:8, 302:19–303:11), his

manager gave a negative response when he asked about receiving extra compensation for days when doctors were overbooked. (Manning Dep. [68-27] at 99:2–102:10.)

Eventually, plaintiff's use of ghost clinics came to the attention of a compliance officer named Ann Cahill. (Cahill Aff. [68-3] ¶¶ 2, 12.) She launched an investigation of plaintiff's time sheets and discovered that he was reporting more hours than the other doctors on defendant's payroll. (*Id.* ¶ 12.) Indeed, Cahill found that plaintiff was the only physician in the medical group to have created ghost clinics in the preceding six month period. (*See id.* at 15.) Based on Cahill's finding as well as plaintiff's poor discipline history, defendant terminated plaintiff during an October 2005 meeting at its Maryland headquarters. (*Id.*) At that time, plaintiff was forty-eight years old. (Compl. [1] ¶ 24.)

While at the Largo facility, defendant had arranged to conduct a clinical trial of a new surgical device. (*See* Lurie Dep. [74-1] at 240:2–12.) To govern the clinical trial, plaintiff, defendant, and the device company (Graftcath) signed a document outlining the terms of their relationship and naming plaintiff principal investigator. (Def.'s Ex. 18. [70] at 2.) When plaintiff was terminated, he was unable to continue serving as principal investigator. (Pl.'s Verified Compl. [72-3] ¶ 38.)

After his removal, plaintiff opened a private medical practice. (Pl.'s Verified Compl. [72-3] ¶ 19.) Though he applied for membership in defendant's network of outside providers, he was rejected. (*Id.*) Efforts to develop his new practice have been hindered by his reduced access to Kaiser Health Group patients, (*see* Lurie Dep. [68-4] at 354:19–355:11), some of whom may have been dissuaded by defendant from seeking treatment with plaintiff despite his status as their preferred surgeon. (*See* Pl.'s Ex. 3 [72-5] ¶ 5; Pl.'s Ex. 4 [72-6] ¶ 5.)

### III.    Defendant's Motion to Strike

Local rule 7(h) requires that a party opposing summary judgment include a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue to be litigated, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h). The purpose of the rule is to aid courts in deciding motions for summary judgment by refining the record to focus on disputed factual issues. *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002). In interpreting the rule, the Circuit Court has prescribed caution, warning of the drastic consequences of striking a party's statement of fact. *Id.* at 517. The remedy should be reserved for those cases involving "egregious conduct." *Id.*

Defendant contends that plaintiff's statement of material fact violates local rule 7(h) and should be stricken. In support of its motion, defendant argues that plaintiff's statement is overlong at 117 pages, is suffused with argument, and fails to squarely address defendant's statements of fact. (Def.'s Mem. in Supp. of Mot. to Strike [78-1] at 2, 4, 11.)

Although plaintiff's statement needlessly extends to 117 pages, it cites to the record and rightfully does not contain legal argument. (*See, e.g.*, *id.* ¶¶ 14, 21, 22, 87, 123.) For example, defendant's statement of material fact affirms, "The letter was sharply critical of WHC's surgery department chairman, John Kirkpatrick in particular." (Def.'s Local Rule 7(h) Statement [68-28] ¶ 14.) In his own statement, plaintiff denies this assertion then launches into a four page description of hospital policy on official complaints and the Code of Ethics of the American Medical Association. (Pl.'s Statement [72-1] ¶ 14.)

While the plaintiff's statement is inappropriately long and evasive, the Court cannot say that a statement of fact which otherwise comports with local rule 7(h) by citing to the record,

separately responding to each of defendant's statements, and refraining from legal argument is egregious and ought to be stricken. *Compare Chambliss v. Nat'l R.R. Passenger Corp.*, No. 05-2490, 2007 WL 581900, at *2 (D.D.C. 2007) (granting a motion to strike where plaintiff's statement did not properly cite the record, interspersed legal argument, and did not correspond to paragraphs in defendant's statement). Accordingly, defendant's motion [78] to strike plaintiff's statement [72-1] is denied.

## IV.    Defendant's Motion for Summary Judgment

### A.  Summary Judgment Standard

Generally, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C.Cir.2002). A genuine issue of material fact exists if the evidence, when viewed in a light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e); *see Celotex Corp.*, 477 U.S. at 324. At the summary judgment stage, a judge may not make credibility determinations, as that is the function of a jury. *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir.2005).

**B. ADEA**

The Age Discrimination in Employment Act (ADEA) forbids an employer from firing an employee on the basis of his age. 29 U.S.C. § 623(a)(1) (2006). The Circuit Court has clearly articulated the standard to be used in evaluating motions for summary judgment in employment discrimination disputes:

> [I]n considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 511 (1993), and *U.S. Postal Serv. Bd. of Governors v. Aiken*, 460 U.S. 711, 714–716 (1983)).[2]

Subsequent to *Brady*, the Supreme Court further focused the ADEA standard. It held, "A plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009). Put differently, it is not enough that age was one motivating factor in an adverse employment action; rather, it must be the case that the adverse action would not have occurred in the absence of age as a consideration. *See id.* at 2350.

Therefore, the Court must decide whether sufficient evidence exists for a reasonable juror to find that defendant's proffered reasons for terminating plaintiff mask discriminatory intent that rendered age the but-for cause of plaintiff's termination. Evidence of pretext may include

---

[2] *Brady* does not expressly address age discrimination claims. However, this Court and the other courts of this district have regularly extended Brady's methodology to claims under the ADEA. *Chappell-Johnson v. Blair*, 574 F. Supp. 2d 87, 96 n.9 (D. D.C. 2008), *aff'd*, 358 Fed. App'x 200 (D.C. Cir. 2009). Hence, the Court does not hesitate in applying *Brady* to the present case.

variant treatment of similarly situated employees, discriminatory statements by decision makers, and irregularities in the stated reasons for the adverse employment decision. *Brady*, 520 F.3d at 495 & n.3. However, discrimination will not be inferred from the fact that defendant's reasons prove unfounded so long as they are held reasonably and in good faith. *Brady*, 520 F.3d at 495. Similarly, an inference of discrimination should not be drawn from disparate treatment of comparable employees unless "all of the relevant aspects of [a plaintiff's] employment situation [are] 'nearly identical'" to those of the comparator. *Neuren v. Adduci, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

In the instant case, defendant asserts that plaintiff was fired for falsifying his time sheets and for his long history of disciplinary problems. (Mem. in Supp. [68-2] at 5.) In order to demonstrate that defendant's stated reasons were only a pretext for age discrimination, plaintiff pursues roughly five distinct lines of argument: (1) plaintiff was replaced by a less qualified, younger physician; (2) plaintiff completed his time sheets consistent with company practice and was the only physician disciplined for so doing; (3) plaintiff's disciplinary history was undeserved and a contrived, post hoc justification for his termination; (4) defendant's managers were aware that the defendant stood to reap financial benefits from terminating older physicians like plaintiff; and (5) defendant's managers made depreciatory remarks about plaintiff's age. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. [72] at 13–14, 16–18.)

### 1. Plaintiff was not "replaced" by a younger doctor

Plaintiff claims that Dr. Aryavand was hired as his more youthful but less meritorious replacement. Specifically, plaintiff alleges that Dr. Aryavand was offered a job only one day before defendant began the investigation which led to plaintiff's termination. (*See* Pl.'s Ex. 37 [69-39] at 2; Cahill Aff. [68-3] ¶ 18.) Dr. Aryavand was thirty-eight at the time he was hired

while plaintiff was forty-eight at the time he was fired. (Aryavand Dep. [72-7] at 22:5–8; Compl. [1] ¶ 24.) Both plaintiff and Dr. Aryavand were vascular surgeons. (Pl.'s Verified Compl. [72-3] ¶ 12; Aryavand Dep. [72-7] at 14:9–12.)

However, plaintiff's evidence provides little basis for a jury to infer that Dr. Aryavand was hired as plaintiff's replacement, much less that plaintiff suffered discrimination thereby. After Dr. Aryavand was hired, he and plaintiff worked at different facilities; whereas plaintiff was employed at defendant's Largo, Maryland center, Dr. Aryavand worked for defendant in Kensington, Maryland and in Washington DC. (Lurie Dep. [68-4] at 120:3–10; Aryavand Dep. [72-7] at 22:11–23:16, 46:13–16.) Furthermore, Dr. Aryavand possessed qualifications that plaintiff lacked; he was a fellowship-trained vascular surgeon while plaintiff did not have such training. (Aryavand Dep. [72-7] at 12:17–21; Lurie Dep. [68-4] at 14:14–18.) Finally, in regards to the timing of personnel decisions, the alleged connection between defendant's offer of employment to Dr. Aryavand and its decision to investigate plaintiff is terribly attenuated. Other than pointing out the conjunction, plaintiff furnishes no evidence from which a reasonable juror could find that the timing of defendant's actions was anything more than a coincidence.

## 2. Defendant acted in good faith in terminating plaintiff for his timesheet practices

Plaintiff alleges that his timesheet practices were in accord with defendant's policies and that he alone was punished for the common practice of creating so-called ghost clinics. In support of his contentions, plaintiff claims that a document obtained from defendant entitled "MAPMG Pay Practices, July 2005" [72-34] verifies that defendant sanctioned the use of ghost clinics. The document, however, cannot be fairly read to support plaintiff's position; nothing indicates that physicians could be paid for multiple double-books during the day by charging for dummy patients treated in the evening. (*See* Pl.'s Ex. 32 [72-34].) For instance, where the report

refers to payments for "extra sessions," it appears to be indicating medical work actually performed after-hours such as "urgent cases in late afternoon or evening," not services for fictitious evening patients. (*Id.* at 2.) In sum, plaintiff's conclusory characterization of this document would not permit a jury to find that ghost clinics were authorized by defendant.

Next, plaintiff argues that establishing ghost clinics was a common practice in which defendant's managers acquiesced. After arriving at defendant's Largo, Maryland medical center, plaintiff's colleagues told him that these extra patients were handled by establishing evening clinics (ghost clinics). (*Id.* at 300:10–15.) Despite the reassurances of his fellow surgeons, plaintiff remained hesitant and prompted the head nurse Sharon Stewart to seek authorization from *her* manager Ms. Williams who then consulted her manager Mr. Labash. (*Id.* at 301:2–11.) Afterwards, Ms. Lawrence informed plaintiff that her managers had given instructions to operate ghost clinics. (*Id.* at 301:12–15.) Note however, that as a surgeon, plaintiff's immediate supervisors were Dr. Manning and Dr. Schwartz. (*Id.* at 40:1–4, 304:6–10.) Though neither Dr. Manning nor Dr. Schwartz ever expressly authorized the use of ghost clinics, plaintiff believed that they tacitly endorsed the practice. (*See id.* at 303:18–306:6.) However, neither Dr. Manning nor Dr. Schwartz, plaintiff's immediate supervisors, ever expressly authorized the use of ghost clinics. (*See id.* at 303:18–306:6.)

While a jury could infer that if plaintiff was not violating company policy, that defendant's stated reasons for terminating plaintiff were pretextual, the record does not support that conclusion. The evidence that defendant approved of the use of ghost clinics addresses the perception of plaintiff and his colleagues, rather than the understanding of his supervisors and the managers involved in his termination. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (stating that a defendant may prevail on summary judgment if there is no genuine issue as

to whether the manager making the termination decision honestly and reasonably believed in defendant's reasons).

There is evidence that relevant managers did not share plaintiff's belief about the acceptability of ghost clinics. For example, when plaintiff asked his supervisor about receiving additional payment for multiple double books, the matter was taken to a higher manager who expressly rejected the idea. (Manning Dep. [68-27] at 99:2–100:5.) Whereas plaintiff's evidence goes to *his belief* in the propriety of ghost clinics and *his understanding* that his supervisors' acquiesced in the practice, the supervisors themselves rejected it.

More importantly, the managers participating in the investigation preceding defendant's termination, Traci Holsteen and Ann Cahill, did not accept the legitimacy of ghost clinics. Holsteen was defendant's Director of Regional Access Services. (Holsteen Aff. [68-16] ¶ 2.) In June 2005, whilst conducting a "routine review of physician schedules," Holsteen noticed that evening sessions had been opened for plaintiff in which patients he had seen earlier in the day were booked. (*Id.*) Subsequently, Holsteen sent an email to plaintiff's supervisors, Dr. Manning and Dr. Schwartz, expressing her concern at her findings. (*Id.* ¶ 3.) She wrote,

> Dr. Lurie is the only surgeon that I am aware of that sees his double books during the day and places them in an extra session in the evening. His timesheet will reflect an additional four hours that was filled with one hour's equivalent of patients that were seen during his regular day. This is not the routine for our approach to scheduling.

(*Id.* at 4.) Eventually, the matter was referred to Cahill. (Cahill Aff. [68-3] ¶¶ 2, 12.) After reviewing plaintiff's time sheets, Cahill recognized that plaintiff was reporting many more hours than his fellow physicians. (*Id.* ¶ 12.) Further exploring company files, she found that no other physician in 2004 or 2005 had created ghost clinics except for plaintiff's surgical colleague Dr. Krolik who created just three ghost clinics in 2004. (*Id.* ¶¶ 12, 14). Following Cahill's

investigation, defendant terminated plaintiff in October of 2005. (*Id.* ¶ 15.) By all appearances, Holsteen and Cahill honestly and reasonably believed that plaintiff's timesheets were improper. Accordingly, no reasonable jury could infer discrimination from the time sheet evidence.

Plaintiff also maintains that while other physicians, including his surgical colleague Dr. Krolik, created ghost clinics, only he was disciplined for doing so. He alleges his disparate treatment is indicative of discrimination. Plaintiff is correct that evidence that similarly situated employees were treated differently is proper fodder for an employment discrimination case. *Brady*, 520 F.3d at 495. However, plaintiff's long disciplinary history and the magnitude of his use of ghost clinics serve to distinguish him from doctors who were not disciplined.[3]

Doctors who used ghost clinics but were not punished include Dr. Cohen, an orthopedist, Dr. McCanty, a urologist, and plaintiff's surgical colleague Dr. Krolik. (Cohen Dep. [72–9] at 18:12–19:14; McCanty Dep. [72-14] at 25:5–21; Cahill Aff. [68-3] ¶ 14; Pl.'s Opp'n [72] at 16.) Plaintiff can be distinguished from Dr. Cohen and Dr. McCanty as neither physician worked in the department of surgery with plaintiff. (*See* Lurie Dep. [68-4] at 287:18–21, 38:13–15.) Additionally, neither doctor is alleged to possess a comparable disciplinary record. As a fellow surgeon, Dr. Krolik is a better candidate for comparison but still possesses significant differences from plaintiff. For one, she used ghost clinics relatively little. (*See* Cahill Aff. [68-3] ¶ 14.) From the beginning of 2004 to October 2005, Dr. Krolik recorded ghost clinics on three occasions while plaintiff did so at least fourteen times during the same period. (*Id.*) What is more, Dr. Krolik had a spotless record. (*Id.*) In contrast, plaintiff had often been in trouble with the company, a fact that defendant considered in deciding to discharge him. (Cahill Aff. [68-3] ¶ 15; *see* discussion *infra* Part IV.B.2.c) Given the different employment situations of the three

---

[3] Comparators must be nearly identical to a plaintiff in all relevant aspects of their employment situation. *Neuren*, 43 F.3d at 1514.

doctors, the Court should not infer discrimination from the fact that they were not similarly punished for maintaining ghost clinics. *See Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 74–75 (D.D.C. 2005) (refusing to find pretext where plaintiff had accumulated record of deceit and insubordination while comparators had never been disciplined).

### 3. Defendant could have terminated plaintiff in good faith based on his disciplinary history

Plaintiff's third argument contests defendant's appeal to past disciplinary incidents as a reason for plaintiff's termination. Evidence of falsehood and inconsistency vis-à-vis stated reasons for termination may be used to infer discriminatory intent. *Brady*, 520 F.3d at 495 & n.3. Plaintiff, however, fails to contest the existence of his disciplinary record and its use as a basis for his firing.

Plaintiff drew the ire of company officials on several occasions. The history of plaintiff's troubles begins in 2001 when he was reassigned from WHC after the head of surgery there complained about his behavior. (Def.'s Ex. 4 [68-6] at 2; Lurie Dep. [68-4] at 83:7–11.) In response to this incident, defendant saw fit to officially warn plaintiff and admonish him about his behavior. (*See* Def.'s Ex. 5 [68-7] at 2.) Two years later, plaintiff was reassigned to WHC, but again the head of surgery complained about his behavior. (Lurie Dep. [68-4] at 102:1–13; Def.'s Ex. 6 [68-8] at 3.) In late 2003, defendant suspended plaintiff with pay and an investigation was conducted of his conduct. (Lurie Dep. [68-4] 152:11–153:12.) It also issued him a reprimand letter and a Performance Improvement Plan. (*See* Def.'s Ex. 8 [68-10]; Def's Ex. 9 [68-11].) Afterwards, plaintiff kept encountering trouble with patients and co-workers alike. (*See, e.g.*, Def.'s Ex. 11 [68-13].)

Plaintiff responds by offering an alternate characterization of his time at the company, one in which he plays the part of the white knight, victimized by defendant for insisting on high

standards of professionalism. (*See* Pl.'s Opp'n [72] at 17.) Yet regardless of whether plaintiff's sanctions were fair or right, defendant could legitimately take plaintiff's record into account in making its decision to terminate plaintiff. It is enough that defendant honestly and reasonably believed in the validity of its bases for terminating plaintiff. *See George*, 407 F.3d at 415.

Plaintiff also tries to show that defendant's invocation of his disciplinary record was pretextual by pointing to awards he received and improvements in his official evaluations. (Pl.'s Opp'n [72] at 17.) Regardless of whether plaintiff received the accolades, defendant still could have honestly and reasonably relied on defendant's past troubles as a basis for his termination. It may well have been foolish to terminate a surgeon as talented as plaintiff but that does not demonstrate that defendant's appeal to plaintiff's disciplinary record was insincere.

Finally, plaintiff contests that his discipline record was part of the original justification for his termination and declares that it was only asserted later to "buttress [d]efendant's case." (*See* Pl.'s Opp'n [72] at 16.) Plaintiff's position, however, is based on a mischaracterization of Cahill's deposition testimony. (*See* Pl.'s Opp'n [72] at 16–17.) In his brief, plaintiff quotes in isolation the following bit of the deposition record: "Q. Was there any other reason why he was terminated? A. No." (Cahill Dep. [72-8] at 156:9–12.) Plaintiff relies on this response to demonstrate that time sheets were the only justification for plaintiff's termination, but when placed in proper context, the cited testimony does not support plaintiff's position. Specifically, plaintiff omits important preceding lines that show Cahill and her questioner were discussing only the text of plaintiff's termination letter, not defendant's reasons for termination more generally. (Cahill Dep. [72-8] at 155:15–156:12.) Moreover, during the same deposition, Cahill had already stated there were other reasons for plaintiff's removal:

> Q. Your testimony earlier today I recall is that this was the only reason he was terminated and I wanted to ask you if, in fact, this is the only reason he was

terminated? A. I don't remember saying it was the only reason. I know that also in consideration was the behavior of Dr. Lurie on previous occasions. Concerns about him were mitigating factors.

(Def.'s Reply Ex. 4 [77-4] 151:3–12.) At the end of the day, Cahill's testimony establishes that disciplinary problems played a role in plaintiff's dismissal.

### 4. Defendant's alleged pecuniary interest in plaintiff's termination does not show discrimination

Plaintiff alleges that defendant stood to gain financially by firing plaintiff as an older doctor. Plaintiff's position here rests on three pieces of evidence. First, he alleges that defendant had changed the rules for its pension program so that physicians hired after 2000 could not retire with full benefits until age 65.[4] (*See* Pl.'s Opp'n [72] at 17.) Second, Cahill once remarked to plaintiff that he was "making too much money." Third, Dr. Aryavand, plaintiff's alleged, younger replacement, was paid less money than and would retire at a later age than plaintiff.

Altering the pension program is not indicative of discriminatory intent. To begin, plaintiff was hired well before the new policy took effect, (*see* Pl.'s Verified Compl. [72-3] ¶ 10), and therefore, he and other longtime employees could not have been dissuaded from remaining with defendant by the change. However, even if the changes did not affect plaintiff, he may still contend that they are indicative of a generalized hostility towards older employees harbored by defendant. On the contrary, increasing the retirement age is suggestive of a desire to retain older physicians past the age of sixty rather than to hurry them out the door. At the end of

---

[4] In his brief, plaintiff describes the pension rules as having been changed so as to exclude physicians hired after 2000 from retiring with full benefits at 65. (*See* Pl.'s Opp'n [72] at 17.) This may misrepresent the development of defendant's pension policy. The record is ambiguous; it may be the case that pre-2001 hires gained the ability to retire at 60 while hires after that date were to be kept ineligible for full retirement until 65. (*See* Def.'s Reply Ex. 1 [77-1] ¶ 4; Pl.'s Ex. 13 [72-15] at 72:20–73:7.) Nonetheless, defendant does not dispute plaintiff's account, and either version of events should yield the same outcome on the discrimination question. Allowing full retirement at sixty would only make employment with defendant more attractive for people in defendant's age group, hardly a way to purge one's payrolls of workers between the ages of 40 and 60.

the day, the Court does not see how a reasonable jury could infer discrimination from changes in the pension plan.

On one occasion, Cahill observed to plaintiff that he was "making too much money." (Lurie Dep. [68-4] at 188:8–10.) Plaintiff interprets her words as expressing a desire to terminate an older, better remunerated employee. Yet what plaintiff omits to mention is that Cahill made the comment while discussing plaintiff's use of ghost clinics. (*Id.* at 188:14–17.) When Cahill expressed her opinion about plaintiff's earnings, the circumstances suggest she did so in relation to the extra pay he was receiving for ghost clinics, not entitlements accrued as an older physician. In proper perspective, there is nothing insidious about Cahill's remark. Nonetheless, plaintiff attempts to link Cahill's comment to the fact that Dr. Aryavand, his alleged replacement, was paid substantially less than plaintiff and would not have been eligible for full retirement until age 65. The Court has already addressed the argument that Dr. Aaryavand was plaintiff's replacement in the negative.

### 5. Isolated, derogatory remarks about plaintiff's age do not show discrimination

Fifth and finally, plaintiff relies on comments made by one of defendant's managers, Dr. Beaverson, about his age. In the course of a meeting at her office, Dr. Beaverson told plaintiff that he had "gotten so old." (Lurie Dep. [68-4] at 59:6–8.) Plaintiff's claims notwithstanding, Dr. Beaverson's comments are insufficient to infer discrimination in the decision to terminate plaintiff. "[S]tray remarks, 'even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff.'" *Talavera v. Fore*, 648 F. Supp. 2d 118, 132 (D.D.C. 2009) (quoting *Simms v. U.S. Gov't Printing Office*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000)). Dr. Beaverson's statement qualifies as a stray remark; after the meeting in question, she and plaintiff had no further contact.

(Lurie Dep. [68-4] at 195:9–14.) More to the point, although Dr. Beaverson was in management, she was not involved in the decision to terminate plaintiff. (*See* Beaverson Aff. [77-2] ¶¶ 3, 7; Lurie Dep. [68-4] 202:19–203:2.) In sum, Dr. Beaverson's statement is insufficient to generate a jury worthy issue on discrimination.

Having separately considered each of plaintiff's arguments, the Court has discovered nothing from which a reasonable jury could infer that the reasons given for plaintiff's discharge were a pretext for unlawful employment discrimination. Given the absence of evidence that defendant's stated reasons were insincere or that age was a factor in, let alone a but-for cause of, plaintiff's termination, the Court will grant summary judgment in defendant's favor on plaintiff's ADEA claim.

## C. ERISA

The Employee Retirement Income Security Act (ERISA) forbids an employer from discharging a participant in an employee benefit plan for the purpose of interfering with the attainment of any right under the plan. 29 U.S.C. § 1140. In interpreting ERISA, the Circuit Court has followed the familiar burden shifting approach employed in Title VII and ADEA cases. *See May v. Shuttle, Inc.*, 129 F.3d 165, 169–70 (D.C. Cir. 1997). Under that framework, the plaintiff is required to first make out a prima facie case of prohibited employer conduct before the burden shifts to the defendant to articulate a legitimate reason for its action. *Id.* at 169. The burden then swings back to the plaintiff to prove that the presented reasons are pretextual. *Id.* at 170.

Though *May* was following the state of the art in employment discrimination jurisprudence, subsequent developments have altered the way courts in this circuit treat ADEA and Title VII claims. *See James v. Int'l Painters and Allied Trades Indus. Pension Plan*, No. 07-

2107, 2010 WL 1741114, at *12 (D.D.C. April 30, 2010). Specifically, the Circuit Court directed in *Brady* that courts considering motions for summary judgment focus on the pretext question. *See Brady*, 520 F.3d at 494. Once the defendant has proffered non-discriminatory reasons for its actions, the court need no longer concern itself with whether the plaintiff has made out a prima facie case. *Id.*

So far, the Circuit Court has not extended the methodology in *Brady* to claims under ERISA. *See James*, 2010 WL 1741114, at *12. However, a fellow court in this district has with good reason opted to apply *Brady* to an ERISA claim. *See id.* Updating ERISA interpretation to correspond with developments in the application of Title VII is consistent with the Circuit Court's approach of maintaining both areas of the law in parallel. *See id.* Thus, the Court's task is to determine whether the evidence is sufficient to allow a reasonable juror to find that defendant's reasons for terminating plaintiff are a pretext for depriving him of his pension benefits.

Plaintiff's evidence in support of his ERISA claim is sparse. Plaintiff relies in large part on his verified complaint in order to make his argument. The relevant section states,

> Upon information and belief, one of the determining factors causing his [plaintiff's] termination was Defendant Kaiser's desire to deprive Plaintiff Dr. Lurie of further participation in "Defendant Kaiser's pension plan and to avoid the adverse economic impact which Plainitff Dr. Lurie's continuation in the plan would cause. Such discrimination was for the purpose of interfering with Plaintiff Dr. Lurie's attainment of rights to which he was entitled under Defendant Kaiser's pension plan, contrary to the provisions of Section 510 of ERISA.

(Pl.'s Verified Compl. [72-3] ¶ 12.)

There is some question as to the evidentiary status of this statement. The Circuit Court has established that a verified compliant may be treated as an affidavit for summary judgment purposes. *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1997). Nevertheless, rule 56(e)

dictates that an "opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e).

Although plaintiff's verified complaint may be dealt with as an affidavit, the statement in question violates rule 56(e) and cannot be accorded weight in deciding the present motion for summary judgment. Though plaintiff claims that his declaration derives from "information and belief," he does not point to specific facts or observations which would support his contention or explain the provenance of his knowledge. (Pl.'s Opp'n [72] at 18.) The court, therefore, will not consider the above section of plaintiff's verified complaint in evaluating the sufficiency of the evidence. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (refusing to credit conclusory portion of plaintiff's affidavit that stated, without support, that she was more qualified than other applicants).

Aside from his verified complaint, plaintiff points to a few stray points in the evidence to support his claim. (*See* Pl.'s Opp'n [72] at 19–20.) First, he relies on Cahill's comment to plaintiff that he was "making too much money." (Pl.'s Opp'n [72] at 19.) As previously addressed, plaintiff takes Cahill's statement out-of-context. Cahill made the comment in the course of a meeting about plaintiff's use of ghost clinics; her reference to "making too much money" was in regard to the extra hours plaintiff was billing, not his pension rights as a longtime employee. (*See* Lurie Dep. [68-4] at 188:8–17.)

Second, plaintiff claims that defendant stood to save substantial sums by terminating him and replacing him with younger doctors, like his alleged replacement Dr. Aryavand, who would receive less lucrative pension packages. (*Id.* at 19–20). Plaintiff claims that his expert, Dr. Bozilleri, is ready to testify that he would have been entitled to more than $900,000 in pension

benefits had he not been fired.  (*Id.* at 20.)  Plaintiff, though, does not cite to record evidence which would confirm the content or availability of Dr. Borzilleri's testimony.  (*See id.*)  Conversely, the record does show that plaintiff was already vested in the pension plan at the time of his termination.  (*See* Lurie Dep. [68-4] at 205:18–21.)  In fact, plaintiff reaped its benefits by electing to accept a lump sum distribution of his pension entitlements shortly after his firing. (Def.'s Reply Ex. 1 [77-1] at ¶ 6.)

Third, plaintiff directs the Court's attention to the deposition testimony of defendant's Chairman of the Board, Dr. Michell.  (*See* Pl.'s Opp'n [72] at 19.)  Plaintiff reads Dr. Michell's testimony for the proposition that defendant "changed its pension plan so that new employees would no longer be able to receive full benefits at age 60."  (*Id.*)  The Court has already noted that plaintiff may have misrepresented Dr. Michell's testimony with respect to the historical development of the pension plan.  Still, for present purposes, the Court may accept plaintiff's characterization as true.

Even if one accepts that the pension plan was altered to prevent new employees from retiring with full benefits at age 60 and that defendant reaped some pension savings by firing plaintiff, a reasonable jury could not infer that defendant's reasons for firing plaintiff were a pretext for depriving him of his pension benefits.  It cannot be the case that every time an employer alters its pension program or choose to fire an employee, the possibility of savings will render its motives sufficiently suspect to create a jury issue.  *See May*, 129 F.3d at 171 ("Plaintiffs must show more than that Shuttle [their employer] furloughed plaintiffs to save money"); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991) ("[Plaintiff's] suggestion that [defendant] acted illegally because it acted to save money proves too much. Under that reasoning, any actions by an employer that result in savings would be

suspect."). Something more is needed to show an illicit motive for the decision to sack an employee, but no such additional evidence was forthcoming in this case. Therefore, defendant's motion for summary judgment on plaintiff's ERISA claim will be granted.

### D. Choice of Law

Plaintiff also asserts a number of common law claims over which the Court has jurisdiction based on diversity of citizenship. When hearing diversity cases, the Court applies the law of the forum state, including its choice of law rules. *See Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). According to the choice of law doctrine of the District of Columbia, the Court's first task is to determine if there is a conflict between the laws of relevant jurisdictions. *Eli Lilly and Co. v. Home Ins. Co.*, 64 F.2d 876, 882 (D.C. Cir. 1985) (citing *Fowler v. A&A Co.*, 262 A.2d 344, 348 (D.C. 1970); *Gaither v. Meyers*, 404 F.2d 216, 222 (D.C. Cir. 1968)). If no conflict exists, it is unnecessary for the Court to make an ultimate choice of law determination. *See id.*

Plaintiff is of the opinion that either District of Columbia law or that of California should apply to his common law claims. (*See* Pl.'s Opp'n [72] at 22.) California, though, is not a serious candidate.[5] For his part, defendant believes that the law of Maryland ought to govern. (*See* Def.'s Reply to Opp'n to Mot. for Summ. J. [77] at 10 n.8, 23.) That being said, the Court believes that identical results will be reached on all claims regardless of whether District of Columbia or Maryland law is applied. Hence, the Court finds it unnecessary to conduct a choice

---

[5] The only link between the present litigation and California is the affiliation of defendant with The Permanente Medical Group, a medical group headquartered in California. (*See* Pl.'s Ex. 17 [72-19] at 2.) Just a glance at the District of Columbia choice of law standard is enough to belie the notion that California law ought to apply. *See Drs. Groover*, 917 A.2d at 1117; *Greycoat*, 657 A.2d at 767–68. The key events underlying this litigation took place either in the District of Columbia or Maryland. (*See, e.g.*, Pl.'s Verified Compl. [72-3] ¶¶ 10, 15, 16, 19.) Plaintiff is a resident of the District of Columbia, and defendant has its principal place of business in Maryland. (Pl.'s Verified Compl. [72-3] ¶¶ 5, 6.) Plaintiff admits the irrelevance of California law insofar as the majority of his analysis follows Maryland and District of Columbia law with only sporadic references to California law and policy preferences. (*See* Pl.'s Opp'n [72] at 22, 28.)

of law analysis and instead will present both District of Columbia and Maryland law as it analyzes each cause of action.

### E. Wrongful Discharge

Plaintiff argues that "wrongful discharge is grounded in both tort and contract" and therefore bases his claim on violations of both defendant's internal policies, like the employee manual, and public policy. Clarifying plaintiff's position, defendant correctly recognizes that plaintiff's wrongful discharge claim actually constitutes two distinct causes of action. Where the plaintiff is relying on defendant's internal documents or employee manual, his claim is an implied contract claim, and where the plaintiff relies on public policy, he is pursuing the tort of wrongful discharge. *Compare Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C. 1999) (discussing the history of the intentional tort for wrongful discharge in violation of public policy), *and Wholey v. Sears Roebuck*, 803 A.2d 482, 488 (Md. 2002) (recognizing wrongful discharge as a tort based on violation of public policy), *with Strass v. Kaiser Found. Health Plan of Mid-Atlantic*, 744 A.2d 1000, 1011 (D.C. 2000) ("The terms of an employer's personnel or policy manual may be sufficient to raise a jury question as to whether the manual creates contractual rights for the employee."), *and Dahl v. Brunswick Corp.*, 356 A.2d 221, 224 (Md. 1976) (allowing that an "employer's policy directives regarding aspects of the employment relationship" may develop into contractual obligations).

### 1. Implied Contract

The District of Columbia and Maryland follow the common law rule that generally an employment relationship is terminable at will. *Strass*, 744 A.2d at 1011 (quoting *Nickens v. Labor Agency of Metropolitan Washington*, 600 A.2d 813, 816 (D.C. 1991)); *Caldor Inc. v. Bowden*, 625 A.2d 959, 965 (Md. 1993). Both jurisdictions recognize that an employer's

internal policies and employment literature may, in certain circumstances, give rise to a contractual right to employment. *Strass*, 744 A.2d at 1011; *Dahl*, 356 A.2d at 224. However, where the internal materials relied upon expressly disclaim contractual intent, "employees may not rely on other statements in the handbook to argue that a contract has been formed." *Hyman v. First Union Corp.*, 982 F. Supp. 8, 12 (D.D.C. 1997) (citing *Castiglione v. Johns Hopkins Hosp.*, 517 A.2d 786, 794 (Md. Ct. Spec. App. 1986). In the District of Columbia, the materials also "must contain language clearly reserving the employer's right to terminate at will" in order to foreclose the possibility of a contractual interpretation. *Boulton v. Inst. of Int'l Educ.*, 808 A.2d 499, 505 (D.C. 2002) (quoting *Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689 A.2d 52, 55 (D.C. 1997)).

Although plaintiff comes before the Court with a heap of defendant's internal papers, the policy documents on which he relies either contain effective disclaimers or are irrelevant to his employment status. Examples of irrelevant policies include defendant's reporting requirements for physicians, Kaiser Permanente's National Patient Safety Program, defendant's Electronic Asset Usage Policy, and defendant's Research and Publications Policy. (*See* Pl.'s Opp'n [72] at 26–27, 34–35.) Other documents which could be construed to alter plaintiff's employment status from that of an at-will employee emphatically disclaim contractual intent and alteration of the at-will relationship. (*See* Pl.'s Ex. 19 [72-21] at 3,12, 25, 43). For instance, though the Progressive Discipline Policy outlines steps to be taken before terminating an employee, it also includes unequivocal terms disclaiming contractual intent and alteration of employees' at-will status. (*Id.* at 3–6.) Since plaintiff is unable to point the Court to any internal policy, not properly disclaimed, that would alter the default at-will employment relationship, the Court will grant summary judgment in favor of defendant on plaintiff's implied contract claim.

### 2. Public Policy Wrongful Discharge

An employee may bring suit against an employer for wrongful termination in violation of public policy. *See Wholey*, 803 A.2d at 488; *Fingerhut*, 738 A.2d at 803. In Maryland, "the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee." *Wholey*, 803 A.2d at 489. While it admitted to making exceptions, the Maryland Court of Appeals strongly cautioned against applying broad notions of public policy that step outside the boundaries of pre-existing law. *See id.* at 490–91. The court stated, "[a] limiting factor in defining a public policy mandate as a cause of action in tort is the notion that the policies should be reasonably discernible from prescribed constitutional or statutory mandates." *Id.*

Adopting similar standards, a majority of the District of Columbia Court of Appeals held that "there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination" which policy must be "firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon." *See Fingerhut*, 738 A.2d at 803 n.7 (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 162, 164 (D.C. 1997) (Terry, J., concurring)).

Plaintiff's public policy arguments center on the claim that his termination was driven by hostility against his unwelcome attempts at exposing and reforming bad medical practices. (*See* Pl.'s Opp'n [72] at 36.) Even if one accepts plaintiff's account of himself as a whistleblower punished for his good deeds, plaintiff is unable to identify an appropriate public policy on which to base his claim.

Some of the policy grounds that plaintiff advances are less appropriate than others. (*See* Pl.'s Opp'n [72] at 27–29, 32.) For example, plaintiff references the professional standards of the American Medical Association and the Medical and Chirurgical Faculty of Maryland. (*See* Pl.'s Opp'n [72] at 27–28, 32.) Given that Maryland and District of Columbia courts have either strongly cautioned against or forbidden the use of extralegal materials in formulating public policy exceptions to the at-will employment doctrine, the Court will not consider the professional standards cited by plaintiff but instead will confine itself to an examination of plaintiff's governmental policy sources. *See Wholey*, 803 A.2d at 490–91; *Fingerhut*, 738 A.2d at 803 n.7.

Plaintiff looks for applicable public policy in a District of Columbia statute, D.C. CODE § 7-161 (2010), requiring that health care providers submit reports of adverse medical events to local government. (*See* Pl.'s Opp'n [72] at 28.) Plaintiff's reliance is misplaced however. Significantly, plaintiff does not allege that he was terminated for attempting to submit the required reports or otherwise take his grievances about patient care to government authorities. Thus, the Court is unable to find the requisite close fit between plaintiff's conduct and a statute clearly expressing favorable public policy.

Plaintiff also seeks support from a Maryland statute, MD. CODE ANN., HEALTH OCC. § 14-502 (West 2010), giving physicians protection from civil liability for reporting information about other physicians to various health care institutions such as hospitals and licensing boards "with the intention of aiding in the evaluation of the qualifications, fitness, or character of a physician." MD. CODE ANN., CTS. & JUD. PROC. § 5-638; (*See* Pl.'s Opp'n [72] at 28, 29–30.) According to plaintiff, "such immunities are granted to physicians to provide incentive for physicians and others to participate in medical peer review and other processes to insure quality medical care." (Pl.'s Opp'n [72] at 29–30.) The relationship, however, between the statute in

question and plaintiff's behavior is too attenuated to meet the stringent standard for recognizing public policy exceptions to the at-will employment doctrine. In particular, the statute makes no mention of a physician's employment status or job security but instead only assures protection from litigation. *See* MD. CODE ANN., HEALTH OCC. § 14-502; *cf. Makovi v. Sherwin Williams Co.*, 561 A.2d 179, 190 (Md. 1988) (holding that plaintiff could not rely on sex discrimination statute to establish a wrongful discharge claim as statute provided its own civil remedy). It also is not specifically addressed to countering medical negligence but rather is explicitly directed to aiding evaluation of physicians' qualifications. *See* MD. CODE ANN., HEALTH OCC. § 14-502 (extending MD. CODE ANN., CTS. & JUD. PROC. § 5-638). Ultimately, the statute does not present a clear mandate of public policy of the kind which the Maryland Court of Appeals cautiously allowed could form the basis of a wrongful discharge claim. *See Wholey*, 803 A.2d at 490–91.

Plaintiff claims that "[f]ederal law encourages physicians to report quality of care issues and grants physicians immunity for reporting quality of care issues." (Pl.'s Opp'n [72] at 28 (citing Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11101, 11111–11115, 11131–37, 11151–52.) However, the statute deals only with narrowly defined professional review actions by professional review bodies, granting civil immunity to the committees themselves and testifying physicians. *See id.* Plaintiff does not allege that he participated on or gave testimony to such a committee. HCQIA is inappropriate as a policy basis for plaintiff's claim.

Plaintiff also cites a federal regulation, 45 C.F.R. pt. 88 (2010), which he interprets as "protect[ing] physicians from being fired, disciplined or penalized . . . for refusing to participate in any care they consider objectionable on ethical, moral or religious grounds." (Pl.'s Opp'n [72] at 28.) The rule is inapposite for several reasons. First, its express purpose is to implement

various statutes which bar recipients of Federal healthcare dollars from prejudicing physicians who refuse on ethical or religious grounds to perform medical procedures or research. *See* 45 C.F.R. § 88.1. Plaintiff has not alleged that defendant is a recipient of such funds. Moreover, the regulation is plainly limited to denying Federal financing to organizations that discriminate on grounds of conscience, not to forbidding the discharge of scrupulous physicians in general. *See id.* Second, though plaintiff objected to working with incompetent or dangerous residents and felt a clash of values with WHC, one would be hard pressed to identify the specific moral convictions underlying plaintiff's objections. (*See* Lurie Dep. [68-4] at 108:3–6, 115:16–116:21.)

Finally, plaintiff invokes another District of Columbia statute, D.C. Code § 44-507, which prescribes procedures for evaluating the qualifications of health care professionals for staff positions and clinical privileges. (*See* Pl.'s Opp'n [72] at 28.) Plaintiff is far off the mark in presenting the statute as a basis for his wrongful termination claim. The law in question does not apply to private medical groups like defendant. *See* D.C. Code § 44-501.

### E. The Graftcath Contract (Breach of Contract and Implied Contract)

Plaintiff asserts two claims based on the Graftcath contract (Contract). First, plaintiff claims that defendant breached the Contract by firing him, making it impossible for him to perform the Contract.. (*See* Pl.'s Opp'n [72] at 36–37.) Second, plaintiff asserts that the Contract created an implied employment agreement which defendant breached when it terminated plaintiff. (*See id.* at 38.) In both cases, the defendant is alleged to have breached the Contract by discharging plaintiff. The resolution of both claims thus turns on the question of whether the Contract limited defendant's right to terminate plaintiff.

Where employer and employee have not agreed upon a period of employment, the District of Columbia and Maryland largely follow the common law rule that the employment relationship is terminable at will. *See Strass*, 744 A.2d at 1011; *Adler v. Am. Standard Corp.*, 432 A.2d 464, 467 (Md. 1981). In this case, the alleged employment contract was memorialized in writing. "As a general rule, the construction or interpretation of all written instruments is a question of law for the court is a principle of law that does not admit of doubt." *Gordy v. Ocean Park Inc.*, 145 A.2d 273, 277 (Md. 1958); *accord 1010 Potomac Assocs. v. Grocery Mfrs. of Am. Inc.*, 485 A.2d 199, 205 (D.C. 1984) ("[T]he interpretation of an integrated contract is a question of law . . ."). For District of Columbia employment agreements, "[i]t has been required . . . that the parties clearly state their intention to alter an at-will employment agreement in order to make such an alteration effective." *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 16 (D.C. 1996) (citing *Littell v. Evening Star Newspaper Co.*, 120 F.2d 36, 37 (D.C. Cir. 1941)). Nevertheless, "[w]here the intent is not clearly revealed by the express terms of the agreement, the courts will look to evidence of surrounding circumstances to determine what was in the minds of the contracting parties." *Littell*, 120 F.2d at 37.

Although aspects of the Contract support plaintiff's interpretation, the Court does not believe that the document can be fairly interpreted to alter the employment relationship between plaintiff and defendant. It is true that as Principal Investigator plaintiff possessed a host of responsibilities for overseeing the clinical trial of the Graftcath device. (*See, e.g.*, Def.'s Ex. 18 at 2.) Equally true, the Contract states, "The Institution [defendant] will conduct the Clinical Trial during the period beginning May 2005, and ending May 2007." (*Id.* at 1). Given his duties on what was to be a multiyear project, plaintiff declares that he was "entitled to an expectation of working for two years." (Pl.'s Opp'n [72] at 39). Nevertheless, nothing in the Contract,

expressly or otherwise, speaks of plaintiff embarking on a course of employment with defendant. In fact, certain language militates against that interpretation. Under the "Background" heading, the Contract states, "The Institution [defendant] employs the Principal Investigator, Kevin Lurie, MD." (Def.'s Ex. 18 at 1). The use of the present tense apparently refers to plaintiff's status as a preexisting employee.

Similarly, under District of Columbia law, the evidence is inadequate to show alteration of the at-will employment relationship. The parties did not clearly state their intention to change plaintiff's employment status. Additionally, plaintiff points to little evidence of surrounding circumstances which would allow the Court to infer that it was the parties' intent to guarantee him employment until the end of the project. (*See* Pl.'s Opp'n [72] at 38). Prior to signing the Contract, plaintiff did play a major role in procuring the clinical trial. (*See* Pl.'s Statement [72-1] ¶ 185; Pl.'s Ex. 10 [72-12] at 240:2–12.) Plaintiff may have felt entitled to remain involved in the clinical trial given his role in procuring it, but since plaintiff had already performed this service, there could have been no quid-pro-quo at the time the parties signed the Contract. *Cf. Riefkin v. E.I. Du Pont De Nemours & Co.*, 290 F. 286, 289 (D.C. Cir. 1923) (finding that where contract spoke of permanent employment and plaintiff had given additional consideration by promising to quit his former job, the parties could not have contemplated at-will employment).

The Maryland reporters contain an employment case similar to that before the Court but with important differences that mark out the limits of Maryland doctrine on when an agreement creates a right to employment for a defined period. *Sperling v. Terry*, 135 A.2d 309 (Md. 1957). In *Sperling*, the Maryland Court of Appeals found that a contract to supervise the construction of a house created an implied right of employment until the completion of the house. *Id.* at 311. The Graftcath contract is significantly different in that it did not originate the employment

relationship or limit that relationship to completion of a single task. *See Lubore v. RPM Assocs.*, 674 A.2d 547, 554 (Md. Ct. Spec. App. 1996) (distinguishing *Sperling* where "the period of appellant's employment was not tied to the accomplishment of any particularly defined task, the duration of which is fixed or finite").[6] Standing alone, plaintiff's expectation that he would continue to be a part of the research project is not enough to prove alteration of the at-will employment relationship. *Cf. Lubore*, 674 A.2d at 554 (finding that plaintiff's employment was at-will despite the fact that plaintiff's contract contained salary projections for the next two years and described job responsibilities involving long term planning).

Whether under Maryland or District of Columbia law, defendant retained the right to terminate plaintiff and did not breach the Contract when it did so. Summary judgment will be granted in favor of the defendant on plaintiff's claims arising under the Contract.

### F. Tortious Interference

Plaintiff alleges that defendant has tortiously interfered with his new and independent surgical practice. (*See* Pl.'s Opp'n [72] at 39.) The elements of tortious interference with contractual or business relations are well established. In Maryland, the tort requires: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 54 (Md. 2003) (quoting *Willner v. Silverman*, 71 A. 962, 964 (Md. 1909)). In the District of Columbia, one must prove: "(1)

---

[6] The interpretation put on *Sperling* by the Maryland Court of Special Appeals (the intermediate court) is well-founded. In the *Sperling* opinion, the Maryland Court of Appeals (the high court) emphasized the contract's one-off character: "It will be noted that the appellant was *not in the building business*. He was going to *erect a single dwelling*, for use as his abode. This, ordinarily, would require between two and four months. For him, it was an *isolated* undertaking. He needed a supervisor, so he employed the appellee to 'supervise and work on the construction of a private dwelling', 'all labor and materials to be furnished by' the appellant." *Sperling*, 135 A.2d at 311 (emphasis added).

existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr.*, 957 A.2d 890, 900 (D.C. 2008) (footnote omitted).

### 1. Defendant did not tortiously interfere with plaintiff's practice by misleading former patients

Plaintiff first argues that defendant discouraged patients from seeing him and misled them about whether their insurance covered treatment by plaintiff. (*See* Pl.'s Opp'n [72] at 40.) Plaintiff points to the experience of Geraldine Edwards and Judy Gantt. (*See id.*) Plaintiff claims that he had an existing business relationship or expectancy with both women, likely referring to care he provided for them while still employed with defendant (*See id.* at 41; Gantt Dep. [72-10] at 27:14–28:9.)

Significantly, plaintiff does not allege that he had a relationship with Gantt or Edwards outside that developed whilst treating them as an employee of defendant. (*See* Pl.'s Opp'n [72] at 4041.). Thus, to the extent that they were plaintiff's clients, they were also defendant's clients, a dispositive fact under Maryland law. Since defendant lacked an independent economic relationship with these potential clients, the defendant could not have tortiously interfered with that relationship. *See Kaser*, 831 A.2d at 59 (finding against insurance subagent who alleged tortious interference against general agent but lacked an economic relationship with the client that was separate and independent).

Plaintiff's evidence is likewise inadequate per District of Columbia standards. Namely, plaintiff fails to make an adequate showing on the elements of intent and damages. "To establish a prima facie case of interference with business relations, 'a plaintiff must show that the interference was intentional and that there was resulting damage.'" *Brown v. Carr*, 503 A.2d

1241, 1247 (D.C. 1986) (quoting *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289 (D.C. 1977)).

If defendant's doctors intentionally misled Gantt and Edwards about their insurance coverage, one could infer intent to interfere with plaintiff's business. However, the evidence that defendants deceived the two patients is vague and equivocal; both women's affidavits merely state, "Drs. Lustgarten and Aryavand discouraged me from seeing Dr. Lurie and told me that my insurance would not cover my care." (Pl.'s Ex. 3 [72-5] ¶ 5; Pl.'s Ex. 4 [72-6] ¶ 5.) Plaintiff's reliance on the affidavits is undercut by the clarifying deposition testimony of Gantt. When asked about her conversations with Drs. Lustgarten and Aryavand, Gantt claims they told her she could not use plaintiff for her surgery. (*See* Gantt Dep. [72-10] at 914). She goes on to clarify though that the doctors were speaking about Kaiser's coverage for procedures performed by plaintiff. (*See id.* at 25:15–26:5.) Gantt explains that she chose to use Kaiser initially but then later opted to use Medicare and be treated by plaintiff. (*See id.* at 26:9–22.) While evidence of deceit could serve as circumstantial evidence of intent to interfere, Gantt's deposition testimony seems to show Drs. Lustgarten and Aryavand explaining the status of Gantt's coverage with Kaiser. It would be a stretch to say they categorically claimed Gantt lacked insurance which would allow her to see plaintiff if she so desired.

Gantt's testimony indicates plaintiff did not suffer damages. As Gantt explained, she was always aware that treatment by plaintiff was an option and that Medicare would pay for that treatment. (*See id.* at 26:3–8.) Though she originally chose to receive treatment from Kaiser practitioners, she ultimately turned to plaintiff for her surgical needs. (*See id.* at 26:1222.) Supporting that testimony, plaintiff admits that he eventually operated successfully on both

32

women.  (*See* Pl.'s Opp'n [72] at 40.)  If Gantt was unaffected by any misinformation on the part of defendant's employees, defendant did not cause plaintiff to lose her business.

### 2. Defendant's decision to refuse plaintiff admission to its referring provider network was not tortious interference

Plaintiff tries to ground his interference claim on defendant's decision to refuse him entry into the Kaiser referring provider network.  (*See id.* at 42).  Supporting his position, he writes, "Plaintiff had a 17-year relationship with Defendant.  He had relationships with the physicians with whom he worked and with the patients he treated."  (*Id.*)  There are several problems with plaintiff's argument.  To begin, plaintiff does not point the Court to examples of harm to his surgical practice produced by the ongoing fissure in the relationships he identifies.  The Court is thus unable to identify any evidence of damages suffered by plaintiff.

Further, the Court cannot discern with sufficient specificity the economic relationships or business expectancies that were allegedly compromised by defendant's actions.  Blanket accusations do not point the Court to the existence of particular "business expectancies" that are "commercially reasonable to anticipate."  *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (describing those relationships that are protected from unjustified interference).

Plaintiff's allegations of broken connections with coworkers and patients are particularly deficient under Maryland law.  To wit, the relationships with coworkers and patients that plaintiff formed while employed with defendant are not independent economic relationships with which defendant might interfere.  *See Kaser*, 831 A.2d at 59.

### 3. If plaintiff was not paid for treating Kaiser patients, his grievance is not with defendant, and his remedy is in contract, not tort.

Plaintiff claims that he has not received payment for seeing patients referred to him by defendant's physicians.  (*See* Pl.'s Opp'n [72] at 41.)  Even if true, this allegation is irrelevant for

two reasons. First, if plaintiff has not been paid for services rendered to patients covered by Kaiser Health Plan insurance, then his grievance is with the Kaiser Health Plan, not with defendant MAPMG. (*See* Lurie Dep. [68-4] at 340:20–342:3.) Second, if defendant or Kaiser Health Insurance has wrongly refused to honor plaintiff's bills, his remedy is in contract, not in tort. Courts have steadfastly resisted efforts to convert an action for breach of contract into a suit for tortious interference. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 650 A.2d 260, 269–270 (Md. 1994); *Raskauskas*, 589 A.2d at 26 (explicating "the common sense notion that a plaintiff should not be allowed to convert a breach of contract claim into a claim for tortious interference").

## V. Defendant's Counterclaims

Defendant asserts causes of action for breach of contract, fraud, negligent misrepresentation, and unjust enrichment. It claims the Court may consider its counterclaim pursuant to both its diversity, 28 U.S.C. § 1332, and supplemental jurisdiction, 28 U.S.C. § 1367. (*See* Countercl. [2] at 1.)

### A. Diversity of Citizenship

The Constitution and statutes limit the subject matter jurisdiction of the Federal Court. *See Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 377 (1994). The Federal Courts have diversity jurisdiction over civil actions between citizens of different states where the amount in controversy is greater than $75,000, exclusive of interests and costs. *See* 28 U.S.C. § 1332. In calculating the amount in controversy, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). Further, "it must appear to a legal certainty

that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul*, 303 U.S. at 289.

When appraising the amount in controversy, courts are not confined to examining the amount of actual damages. For instance, courts should include the value of any injunctive or declarative relief sought. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt*, 432 U.S. at 347. Further, the value may be measured from either the perspective of the plaintiff or the defendant. *See Comm. for GI Rights v. Calloway*, 518 F.2d 466, 472 (D.C. Cir. 1975) (quoting *Tatum v. Laird*, 444 F.2d 947, 951 (D.C. Cir. 1971), *rev'd on other grounds*, 408 U.S. 1 (1972)).

Requests for punitive damages should likewise be considered, *Bell v. Preferred Life Assurance Soc'y of Montgomery, Ala.*, 320 U.S. 238, 240 (1943), albeit with a skeptical eye. "In applying the legal certainty test where the availability of punitive damages is the sine qua non [essential element] of federal jurisdiction the District Court should scrutinize the punitive damage claim to ensure that it has at least a colorable basis in law and fact." *Kahn v. J. W. Wilson & Assocs*, 673 F.2d 547, 549 (D.C. Cir. 1982) (citing *Zahn v. International Paper Co.*, 469 F.2d 1033, 1034 n.1 (2d Cir. 1972), *aff'd*, 414 U.S. 291 (1973); *Nelson v. Keefer*, 451 F.2d 289, 293–98 (3d Cir. 1971). "Liberal pleading rules are not a license for plaintiffs to shoehorn essentially local actions into federal court through extravagant or invalid punitive damage claims." *Id.* at 549.

To evaluate punitive damages requests, "[f]irst, the court must determine whether the plaintiff can recover punitive damages as a matter of governing substantive law. *Nwachukwu v. Carl*, 223 F.Supp. 2d 60, 66 (D.D.C. 2002) (citing *Bell v. Preferred Life Assurance Soc'y of Montgomery,*

*Ala.*, 320 U.S. 238, 240 (1943)). If the plaintiff can recover as a matter of law, "the court has subject matter jurisdiction unless it is clear beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount." *Id.* (citing *Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1212 (7th Cir.1995)). In this second step, the plaintiff must present factual evidence of entitlement to punitive damages. *Id.* (citing *Larkin v. Brown*, 41 F.3d 387, 388–89 (8th Cir.1994)); *see also McQueen v. Woodstream Corp.*, 672 F. Supp. 2d 84, 88 (D.D.C. 2009).

In contrast to the acceptance of punitive damages, courts in this circuit have refused to take into account attorney's fees when deciding whether a litigant has met the jurisdictional minimum, albeit with an exception for fees provided for by statute or contract. *See G. Keys PC/Logis NP v. Pope*, 630 F.Supp. 2d 13, 17 (D.D.C. 2009) (citing a number of examples).

In the instant case, although the defendant invokes the Court's diversity jurisdiction, it does not request a specific amount of damages or give an estimate of the amount of damages it hopes to recover. (*See* Countercl. [2] at 1, 4.) Instead, at the bottom of its complaint, defendant requests, "1. Consequential and punitive damages in an amount to be proven at trial; 2. An accounting for all compensation received by Lurie based on falsified records and information submitted to MAPMG; 3. The costs incurred by MAPMG in prosecuting this Counterclaim; and 4. Such other relief deemed appropriate by the Court." (*Id.* at 4.) As a result, the Court must look to the body of the complaint to ascertain the basis for the anticipated damages.

### 1. Defendant's actual damages are far less than $75,000

With respect to actual damages, defendant seeks the same recovery for each of cause of action. (*See id.* at 2–4.) For the breach of contract, fraud, and negligent misrepresentation claims, defendant declares that it has sustained damages in the amount of compensation that was

paid to plaintiff for ghost clinics. (*See id.*) Similarly, defendant's unjust enrichment claim is presumably based on the monies retained by plaintiff that he derived from ghost clinics. (*See id.* at 4.) Defendant's alleged actual damages in this case are therefore equivalent to the payments plaintiff received from operating ghost clinics.

To determine the magnitude of the ghost clinic payments defendant could prove at trial, the Court looks to the record. The affidavit of Ann Cahill furnishes the most obvious guidepost; she avers, "Dr. Lurie had obtained *at least* $8,344.96 in extra pay by submitting falsified time sheets which showed that he had worked the ghost clinics." (*See* Cahill Aff. [71-2] ¶ 7 (emphasis added.)) Assessing Cahill's statement, the Court is aware that Cahill is literally stating a minimum figure. Still, $8,344.96 is a reasonable estimate in light of the number of ghost clinic hours that plaintiff claimed. Looking at the alleged offending time sheets, defendant added fifty-six hours to his timesheets for ghost clinics. (*See* Dr. Lurie's Timesheets Re: Ghost Clinics [71-6].) Though the Court has not located information in the record that would allow it to determine the pay rate for the hours, useful assessments can be made from this information nonetheless. If one divides the sum given by Cahill by fifty-six, one finds a plausible hourly rate of $149.02. In contrast, plaintiff would have had to receive $1,339.29 for each ghost clinic hour in order to reach the jurisdictional minimum of $75,000.[7] The number referenced by Cahill, $8,344.96, appears then to be a reasonable estimate of the amount of actual damages which defendant could prove at trial. A substantially greater estimate, one approaching $75,000 for instance, would be unfounded.

---

[7] For comparison, by the time he was fired in October of 2005, Dr. Lurie's W2 wages for that year stood at $317,424.17. (*See* Cahill Aff. [68-1] ¶ 19.) If he were generally being compensated at a rate of $1,339.29 per hour, he would have only had to work approximately 237 hours to earn that sum, just roughly six forty hour weeks.

## 2. Defendant is not entitled to punitive damages

Given special circumstances, both the District of Columbia and Maryland allow a litigant to recover punitive damages. "Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing." *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1123 (Md. 1995). In the District of Columbia, "Punitive damages may be awarded 'only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.'" *Chatman v. Lawlor*, 831 A.2d 395, 400 (D.C. 2003) (quoting *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995)). The state of mind required is similar to that in Maryland, "outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Id.* (quoting *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 593 (D.C. 1985)). In either jurisdiction, the requisite bad conduct for an award of punitive damages must be proven by clear and convincing evidence. *See Chatman*, 831 A.2d at 400; *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 657 (Md. 1992). Further, neither jurisdiction will allow punitive damages to be imposed for a pure breach of contract. *See Bowden v. Caldor, Inc.*, 710 A.2d 267, 276 (Md. 1998); *Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1090 (D.C. 2008) (quoting *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982)).

Though defendant requests punitive damages in its complaint, it does not explain the basis for that request. (*See* Countercl. [2] at 4.) In particular, it fails to identify the specific claims for which it believes imposition of punitive damages is appropriate. However, defendant does allege facts in connection with its fraud claim which if properly proven would entitle it to recover punitive damages. (*See id.* at 3.) It writes, "Lurie acted willfully, maliciously,

intentionally, knowingly, and in wanton disregard of MAPMG's rights and interests by submitting the falsified reports and information." (*Id.*)

Defendant fails to substantiate its allegation with argument or evidence. In its brief, defendant broadly claims that plaintiff engaged in "conduct which a jury could reasonably find Dr. Lurie had pursued to circumvent MAPMG's practice of not paying surgeons additional compensation based on the number of patients seen during the normal work day." (Def.'s Opp'n [71] at 20.) Defendant's representations notwithstanding, the Court cannot locate adequate evidence speaking to plaintiff's mental state. Since plaintiff is without a basis for justifying his punitive damage request, the Court will not consider defendant's request for punitive damages in determining the amount in controversy. In making its decision, the Court is mindful of the admonition of the Court of Appeals to carefully examine clams for punitive damages so as to prevent unsubstantiated requests for punitive damages from becoming a password into the Federal courts. *See Kahal*, 673 F.2d at 549.

### 3. The value of the declarative relief sought by plaintiff is negligible

Regardless of which method is used to quantify its value, the Court cannot imagine attaching a high price tag to the accounting requested by defendant. Defendant assumedly possesses all of the relevant documents; it produced plaintiff's allegedly fraudulent timesheets in discovery. (Lurie's Timesheets [71-6].) Since the timesheets number just twenty-nine pages, the Court was able to count the allegedly fraudulent hours in a matter of minutes with nothing more than a pen and paper tally. One assumes that defendant could take the same steps then multiply the number of hours by the rate it paid plaintiff and do it all for less than $10,000. At the end of the day, the Court has no reason to assign a substantial value to the accounting sought by defendant.

Of the possible bases for relief considered, only plaintiff's request for consequential damages involves a substantial sum. Nonetheless, the allegedly undeserved payments to plaintiff plainly do not amount to more than the statutory minimum. Accordingly, the Court finds that it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul*, 303 U.S. 283 at 289. As a result, the Court lacks jurisdiction pursuant to § 1332.

### B. Supplemental Jurisdiction

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. However, district courts have discretion to refuse to exercise supplemental jurisdiction in certain circumstances, including when "the district court has dismissed all claims over which it has original jurisdiction." *Id.*

The Court has determined that summary judgment is proper with respect to the claims in plaintiff's complaint over which it has original jurisdiction. All of the causes of action described in defendant's counterclaim are founded in state law and have been found to lack an independent basis in the Court's diversity jurisdiction. The Court can and will exercise its discretion to dismiss them.[8] *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) ("Whether to retain jurisdiction over pendent state and common law claims after the dismissal of the federal claims is 'a matter left to the sound discretion of the district court' that we review for abuse of discretion only." (quoting *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265-66 (D.C.Cir.1995)).

---

[8] Since the Court would exercise its discretion to dismiss the claims given either outcome, the Court need not decide whether the counterclaim forms part of the same case or controversy as the claims in the original complaint over which it has original jurisdiction.

### V.    Conclusion

Despite its faults, plaintiff's statement of material fact is not so improper as to justify striking it.  Accordingly, defendant's motion [78] to strike will be DENIED.  Since plaintiff fails to present sufficient evidence from which a reasonable jury could find in his favor, the Court will GRANT defendant's motion [68] for summary judgment.  Finally, the Court finds diversity jurisdiction lacking over defendant's counterclaims and declines to exercise supplementary jurisdiction.  Therefore, the Court will DISMISS defendant's counterclaims and does not reach plaintiff's motion [69] for summary judgment.

A separate order shall issue this date.


August 9, 2010                                                    _____/s/_____
                                                                         ROYCE C. LAMBERTH
                                                                         Chief Judge
                                                                         United States District Court