UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
**DEAN KEVIN LURIE, M.D.,**         )
     Plaintiff,                     )
                                    )    Civil Action No. 06-01386 (RCL)
          v.                        )
                                    )
**MID-ATLANTIC PERMANENTE**         )
**MEDICAL GROUP, P.C.,**            )
     Defendant.                     )
_____ )

## MEMORANDUM OPINION

Before the Court is plaintiff's Motion to Alter or Amend Judgment. Upon consideration of the Motion, the Opposition thereto, the Reply brief, applicable law, and the entire record, the Court will deny the Motion for the reasons that follow.

### I. FACTUAL BACKGROUND

Dr. Kevin Lurie worked as a surgeon for Mid-Atlantic Permanente Medical Group ("Mid-Atlantic") or its predecessor company from 1988 until he was fired in October 2005. Lurie Dep. 17, 187, Oct. 6, 2008, ECF No. 68-4. Mid-Atlantic doctors treat patients at over thirty Mid-Atlantic-run medical centers in Virginia, Maryland, and the District of Columbia, as well as certain other hospitals in the area. Cahiff Aff. ¶ 4, Nov. 21, 2008, ECF No. 68-3. Dr. Lurie had a thriving surgical practice, specializing in general and vascular surgery and treating patients throughout D.C. and Maryland. *E.g.*, Lurie Dep. 6. Dr. Lurie was also the principal investigator on clinical trials to develop a new medical device, a combination graft catheter system, that would aid human dialysis. *Id.* 234–35.

1

After working at the Washington Health Center ("WHC") in the District of Columbia for three years, Dr. Lurie began to question the quality of Mid-Atlantic's medical care. *Id.* 85–86. Dr. Lurie was disturbed by what he believed were "wide variations from [the] standard of community care" that were—in his eyes—"perhaps negligent and malpractice." *Id.* at 86. In addition to being troubled by other doctors' treatment of their own patients, as any concerned colleague would be, Dr. Lurie was also troubled by how WHC doctors and staff treated his own patients. To remedy the problem, Dr. Lurie made a presentation to the hospital's surgical oversight committee. *Id.* at 67–74.

Dr. Lurie's presentation was fiercely critical. Not only did Dr. Lurie tell the committee that "patients were treated badly and in an unsafe fashion," but he also stated that the hospital treated Mid-Atlantic physicians like "second-class citizens." *Id.* at 75. According to Dr. Lurie, WHC provided "poor," "incompetent," and perhaps even "dangerous" staff coverage to doctors affiliated with Mid-Atlantic; all seemingly valid grounds for protest. *Id.* at 74. Yet upon hearing of Dr. Lurie's presentation, Mid-Atlantic scolded Dr. Lurie and warned him not to repeat his "destructive" protests, because they jeopardized Mid-Atlantic's "efforts to build a constructive working relationship with WHC." Mem. from Dr. Manning to Dr. Lurie, July 11, 2001, ECF No. 68-7. The facts do not indicate whether Dr. Lurie continued to complain, but he certainly never reported or threatened to report these issues to governmental bodies or other external entities. Lurie Dep. at 218–21.

On top of his difficulties with the hospital staff and administration, Dr. Lurie also did not get along with his colleagues, who he described as "inexperienced." *Id.* at 116. The other doctors and surgical residents had personal gripes with Dr. Lurie too, so much so that the Chairman of Surgery, Dr. Kirkpatrick, stated that Dr. Lurie's mere presence "incites . . . discord, hyperbole,

and increasing tension," as if he walked about with an air of dissonance. Letter from Dr. Kirkpatrick to Dr. Manning, June 22, 2001, ECF 68-6.

The reason for this tension is unclear. On the one hand, Dr. Lurie suggests it was a reaction to his repeated safety and quality of care complaints—a reaction by those who resented Dr. Lurie's purportedly constructive criticism. Lurie Dep. 85–86. On the other hand, Dr. Kirkpatrick maintains that "Dr. Lurie's practice style in and out of the operating room has created tension and concern among the surgical residents." Letter from Dr. Kirkpatrick to Dr. Manning, June 22, 2001. In other words, the way in which Dr. Lurie practiced medicine was somehow off-putting and perhaps even unsafe. Dr. Kirkpatrick further suggested that Dr. Lurie's criticisms were meant to "strike back" against colleagues' belief that *he* was "an 'unsafe' surgeon." *Id.* Whatever the reason, Dr. Lurie and his superior each ascribed the tense atmosphere to the hospital or Dr. Lurie, respectively. To restore the smooth operation of WHC's surgical department, Dr. Lurie was reassigned to Holy Cross Hospital in Silver Spring, MD. *Id.*; Lurie Dep. 85–86.

Nonetheless, Dr. Lurie was transferred back to WHC in 2003 when the hospital needed more experienced surgeons. Lurie Dep. 102. Upon his return, Dr. Lurie continued to have problems with other doctors. Again, Dr. Lurie complained about the quality of care, and again, his superior attributed the tension to Dr. Lurie's failure to "seek and gain the respect of the resident staff." Letter from Dr. Kirkpatrick to Dr. Manning 2–3, Sept. 9, 2003, ECF No. 68-8. Within a few short months of Dr. Lurie's return, Dr. Kirkpatrick warned Dr. Lurie that he was engaged in "a crescendo of abusive behavior." Letter from Dr. Kirkpatrick to Dr. Lurie 2, Nov. 6, 2003, ECF No. 68-9. It was as if Dr. Lurie had never left: his actions perpetuated a "persistent breakdown in relations with the surgical residency dating back at least to 2001." *Id.* at 1.

According to Dr. Lurie, he "did not get along with the surgical residents, because [he] didn't think it was safe for them to scrub with [him]." Lurie Dep. 116. Indeed, "many of the surgeons . . . got fired . . . because they weren't performing up to par." *Id.* at 117. On account of these problems, and despite WHC's need for more experienced surgeons, Dr. Lurie was transferred to another D.C. site, Mid-Atlantic's North Capital Street center. *Id.* at 119–20.

Later in November 2003, the discord between Dr. Lurie and Mid-Atlantic peaked. A quality review committee ordered Dr. Lurie to follow a "performance improvement plan" that required him to—among other things—"refrain from blaming others" for work-related incidents. Performance Improvement Planning Form, Nov. 24, 2003, ECF No. 68-11. Dr. Lurie disputes this assessment, claiming that the committee members would "beat on the drum . . . to find something they didn't like and cite [him]" for it; in Dr. Lurie's case, this was his commitment to raising quality of care issues. Lurie Dep. 98. According to Dr. Lurie, the committee's sole function was actually to "intimidate physicians" who raised quality of care issues. *Id.* at 99.

Eventually, the beleaguered Dr. Lurie was transferred in 2004 to Mid-Atlantic's Largo, Maryland center. *Id.* at 119–20. But the behavioral problems continued there, too. A few months before he was fired, Dr. Lurie was asked to leave a training session for being "uncooperative and disruptive." Written Warning Letter from Dr. Schwartz to Dr. Lurie, May 26, 2005, ECF No. 68-14. Again, Dr. Lurie blamed the trainer and his superior for blowing the incident out of proportion. According to Dr. Lurie, he had been asked to leave because of racial prejudice, his age, and because he had been reading a newspaper with his friend's son's obituary. Lurie Dep. at 183–84, 186–87. Dr. Lurie continued to regularly see patients in D.C. until his discharge in 2005. *Id.* at 119. This work consumed a small fraction of his time and did not involve surgery. *Id.*

When he was fired, Dr. Lurie was also seeing patients at Holy Cross Hospital in Silver Spring, Maryland. *Id.* at 118. In October 2005, Dr. Lurie was terminated. *Id.* at 120.

Mid-Atlantic claims it fired Dr. Lurie for his disciplinary problems and for allegedly falsifying time sheets. Mem. Supp. Def.'s Mot. Summ. J. 11, Jan. 29, 2010, ECF No. 68-2. Mid-Atlantic often double-booked patients, and Dr. Lurie would record fake evening appointments as extra billed hours to compensate for the increased daytime workload. Lurie Dep. 284–86, 300–02. In contrast, Dr. Lurie says he followed an accepted billing method and was actually fired because he reported quality of care concerns, he was Jewish, and Mid-Atlantic wanted to circumvent its responsibilities to pay his pension. Lurie Dep. 86–87, 122, 186, 300.

## II. PROCEDURAL BACKGROUND

In 2006, Dr. Lurie sued under D.C. and Maryland common law for wrongful discharge, breach of contract, and tortious interference. Compl. 10–12, Aug. 4, 2006, ECF No. 1. He also sued under federal law for employment discrimination in violation of the Age Discrimination in Employment Act (ADEA) and the Employee Retirement Income Security Act (ERISA). *Id.* at 8–10. Mid-Atlantic countersued for breach of contract, fraud, negligent misrepresentation, and unjust enrichment. Countercl. 10–13, Sept. 5, 2006, ECF No. 2.

The Court dismissed Mid-Atlantic's counterclaims for lack of jurisdiction and granted Mid-Atlantic's motion for summary judgment on all of Dr. Lurie's claims. *Lurie v. Mid-Atlantic Permanente Medical Group*, 729 F. Supp. 2d 304, 313 (D.D.C. 2010). In particular, the Court's ruling on the common law claim for wrongful discharge, which Dr. Lurie now moves to alter, was that Dr. Lurie was "unable to identify an appropriate public policy on which to base his claim." *Id.* at 326. Under both D.C. and Maryland common law, an employee may sue for wrongful discharge if the discharge violates a clear mandate of public policy as announced by a

constitution, statute, or regulation. Dr. Lurie offered several statutes, regulations, professional standards, and internal company policies that the Court found insufficient to support a wrongful discharge claim. *Id.* at 327–28. For instance, one relevant statute was D.C. Code Section 7-161, which requires health care providers to report adverse medical events. D.C. Code § 7-161 (2010). Dr. Lurie claimed his repeated complaints to hospital administrators and oversight committees were protected under this statute. The Court held otherwise, finding that Dr. Lurie "[did] not allege that he was terminated for attempting to submit the required reports or otherwise take his grievances about patient care to government authorities." 729 F. Supp. 2d at 327.

Dr. Lurie now moves under Rule 59(e) to alter this Court's ruling on his wrongful discharge claim, relying on a recent Maryland Court of Appeals case that he claims is an intervening change in Maryland law. In *Lark v. Montgomery Hospice*, 994 A.2d 968 (Md. 2010), nurse Susan Lark was fired by the Montgomery Hospice after discovering and internally reporting the improper prescription and shipment of adult doses of narcotics to pediatric patients' homes. 994 A.2d at 970–71. Over the prior year, Lark had reported to her supervisors other instances of misconduct, including improper documentation, a lack of clinical supervision, and errors in the delivery of other medicine besides narcotics. *Id.* at 972. After being fired, Lark sued for wrongful discharge in violation of public policy under either Maryland common law or the Health Care Worker Whistleblower Protection Act, Md. Code Ann., Health Occ. §§ 1-501 to 1-506 (West 2002), claiming both protected her from being fired for reporting quality of care issues. *Id.* at 971.

On a motion for summary judgment, the Maryland trial court found that Lark's internal reports did not come within the scope of activity protected by the Act, because Lark did not report or threaten to report the issues to an external body. *Id.* at 974–75. The trial court also

found that Lark's discharge did not violate public policy, so Lark's common law claim failed as well. *Id.* The Maryland Court of Appeals reversed, stating that "the report of unlawful acts to an external board is not a condition precedent to a civil action under the Act." The Court of Appeals then remanded the case to the trial court for further proceedings.

Dr. Lurie argues that *Lark* is an intervening change in the law governing this Court's decision on his common law wrongful discharge claim. He believes that *Lark*'s holding about external reporting requires the Court to alter its denial of his wrongful discharge claim.

### III. THE LEGAL STANDARD FOR RULE 59(e)

Rule 59(e) allows a district court to correct its own mistakes in the period immediately following the entry of an order. *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450 (1982). Though a court has considerable discretion in granting Rule 59(e) motions, it only needs to do so when it finds that there has been an intervening change of controlling law, that new evidence is available, or that granting the motion is necessary to correct a clear error or to prevent a manifest injustice. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam). Moreover, "[a] Rule 59(e) motion to reconsider is [neither] . . . an opportunity to reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995), nor a vehicle for presenting theories or arguments that could have been advanced earlier. *Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993). And Rule 59(e) motions are generally granted only in extraordinary circumstances. *Liberty Prop. Trust v. Republic Props. Corp.*, 570 F. Supp. 2d 95, 97 (D.D.C. 2008) (citing *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001)).

## IV. DISCUSSION

This Court previously held that none of Dr. Lurie's state law claims, which were before the Court because of diversity jurisdiction, could survive summary judgment under Maryland or D.C. law, and therefore did not conduct the choice of law analysis for each individual claim. 729 F. Supp. 2d at 325. Now, to decide whether *Lark* represents an intervening change of controlling law requiring reconsideration, the Court must first decide which jurisdiction's law—Maryland's or the District of Columbia's—controls. After concluding that D.C. law applies, the Court concludes that Dr. Lurie's new Maryland case is inapposite. Nonetheless, the Court also explains that Dr. Lurie's Motion would fail even if *Lark* did apply. Finally, the Court denies Dr. Lurie's request to use his Rule 59(e) motion to bring a new claim under the Health Care Worker Whistleblower Protection Act.

### A. Choice of Law

D.C. federal courts must use D.C. choice of law rules to decide conflict of law questions. *Perkins v. Marriott Int'l, Inc.*, 945 F. Supp. 282, 284 (D.D.C. 1996). D.C. law uses a "governmental interests analysis" to choose which jurisdiction's substantive law applies to tort cases, in which a court weighs each jurisdiction's interest in having its law apply. *Id.* In this analysis, a court must consider the jurisdictions' interests regarding "the various distinct issues to be adjudicated" as well as the jurisdictions' general interests. *Estrada v. Potomac Electric Power Co.*, 488 A.2d 1359, 1361 (D.C. 1985). A court must also consider: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship is centered." 945 F. Supp. at 284.

Applying this test, the Court finds that the District of Columbia's governmental interest outweighs Maryland's, so the Court will apply D.C. law. Consequently, the Maryland case Dr. Lurie offers is irrelevant.

D.C. has a strong interest in applying its law, because Dr. Lurie and Mid-Atlantic's relationship was centered in D.C. Dr. Lurie began his Mid-Atlantic employment at a D.C. site, WHC. Lurie Dep. 85–86. He continued seeing patients in D.C. at WHC and at the North Capital Street center throughout his employment. *Id*. at 119. His disruptive actions in D.C.—some of which involved calling attention to poor treatment of patients and doctors—prompted Mid-Atlantic to transfer him out of D.C. For example, in 2001, Dr. Lurie made a highly critical presentation to a surgical quality committee in D.C., after which Mid-Atlantic issued a stern warning and transferred him to a Maryland hospital. *Id*. at 75, 85–86. Then, in 2003, after being transferred back to a D.C. hospital, Dr. Lurie refused to operate alongside other surgeons, because he believed their inexperience endangered his patients. *Id*. at 116. In response, the D.C. hospital took the extraordinary step of banning all of its surgical residents from treating Dr. Lurie's patients. *Id*. at 114–15. These and other problems again caused Mid-Atlantic to transfer Dr Lurie out of D.C. If Mid-Atlantic fired Dr. Lurie for raising quality of care issues, they were certainly issues Dr. Lurie faced and challenged while working in D.C.

D.C. also has a general interest in applying its law. If a multi-state employer could circumvent a wrongful discharge claim supported by D.C. public policy by transferring an employee to another state and then firing him, D.C.'s wrongful discharge law would be greatly weakened. Here, Mid-Atlantic dealt with Dr. Lurie's complaints for years while keeping him based primarily at D.C. sites; only when Mid-Atlantic was almost at its wits' end, did Mid-Atlantic transfer Dr. Lurie to Maryland. About a year and a half later, Mid-Atlantic fired Dr.

Lurie. This series of actions could plausibly be considered an attempt to circumvent a wrongful discharge claim supported by D.C. public policy.[1]

Although Dr. Lurie's injury and the conduct causing it—Dr. Lurie's firing and the decision to fire him—happened at Mid-Atlantic's Rockville, Maryland site, Cahill Aff. ¶15, none of the other factors relevant to the "governmental interests analysis" favor Maryland over D.C. The domicile, residence, nationality, place of incorporation, and place of business of the parties do not favor either Maryland's or D.C.'s interest, because both Dr. Lurie and Mid-Atlantic have mixed ties to each jurisdiction. Mid-Atlantic is a Maryland corporation and has Maryland and D.C. places of business, and Dr. Lurie lives in D.C., worked mostly at D.C. sites for seventeen years, but had been working primarily at Maryland sites for about a year and a half before he was fired. Complaint 4; Lurie Dep. 120.

Further, *both* D.C. and Maryland have a similar interest in maintaining their standards of medical care, which a health care provider would jeopardize by firing whistleblowers who question standards of care. The facts of this case, though, indicate that most if not all of Dr. Lurie's supposed whistleblowing was centered around Mid-Atlantic's WHC site in D.C. Indeed, Dr. Lurie originally argued that D.C. law, *not* Maryland law, should apply to his claims.[2] Pl.'s Opp'n Mot. Summ. J. 22, Mar. 1, 2010, ECF No. 72. An observer unfamiliar with the leeway the American legal system accords to plaintiffs raising mutually exclusive arguments might even interpret Dr. Lurie's opportunistic flip-flopping as a waste of the Court's time.

In any event, in light of the application of D.C. law to Dr. Lurie's wrongful discharge claim, Dr. Lurie's main contention is nonsensical. This Court previously held that when Mid-Atlantic fired Dr. Lurie, it did not jeopardize D.C.'s interest—as embodied in D.C. Code § 7-161

---

[1] In its prior opinion, this Court found no support under D.C. law for Dr. Lurie's claim. 729 F. Supp. 2d at 313.
[2] Dr. Lurie also argued that California law should apply, because Mid-Atlantic had some affiliation with a California-based entity.

(2010)—in health care providers reporting adverse medical events to the government. 729 F. Supp. 2d at 327. This Court explained that Dr. Lurie did not externally report or threaten to report his grievances to government authorities, so firing him did not come within the scope of the public policy this statute announces. *Id*. No development in Maryland law could affect this conclusion, so Dr. Lurie's Motion must fail.[3]

Even if Maryland law did apply, the *Lark* decision does not change the Maryland common law of wrongful discharge such that Dr. Lurie's claim is now viable.

### B. Common Law Wrongful Discharge Claim

The claim of wrongful discharge under Maryland common law "is inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 180 (Md. 1989). A "clear mandate of public policy" is "a preexisting, unambiguous, and particularized announcement, by constitution, enactment, or prior judicial decision, directing, prohibiting or protecting the conduct (or contemplated conduct) in question, so as to make the Maryland public policy on the topic not a matter of judicial conjecture or even interpretation." *Sears, Roebuck & Co. v. Wholey*, 779 A.2d 408, 419 (Md. Ct. Spec. App.). Accordingly, Maryland has an exacting standard for how clear and established a public policy mandate must be to support a common law wrongful discharge claim. To prevail on this Motion, Dr. Lurie must show that, under *Lark*, his wrongful discharge claim was supported by (1) a clear mandate of public policy (2) not otherwise vindicated by a civil remedy.

---

[3] Dr. Lurie's argument that firing him violated the public policy announced by D.C. Code § 3-1205.14(a)(26) (1995), Mem. P. & A. Supp. Pl.'s Mot. Alter or Amend J. 7–8, Sept. 7, 2010, ECF No. 87, is flawed for the same reason.

11

### 1. A Clear Mandate of Public Policy

*Lark* does not change the fact that Dr. Lurie's wrongful discharge claim was not supported by a clear mandate of public policy. First, if Dr. Lurie wanted to rely on the public policy described in *Lark*, he should have done so when he filed his original complaint. Although *Lark* had not yet been decided, the statute *Lark* describes as "an unambiguous and particularized pronouncement of Maryland public policy," the Health Care Worker Whistleblower Protection Act, did exist in its current form when Dr. Lurie first sued. Dr. Lurie cannot now introduce a source of clear public policy that existed before. A Rule 59(e) motion is not a vehicle to introduce arguments that could have been advanced earlier. 995 F.2d at 276.

Second, even if *Lark* clarifies or changes Maryland's public policy, that is—at best—evidence that the prior public policy was a "matter of judicial conjecture or even interpretation" and was not sufficiently "unambiguous" to support a claim. 779 A.2d at 419. Moreover, *Lark* does not address the *common law* cause of action for wrongful discharge. Although the *Lark* court cites some out-of-state cases about wrongful discharge, it does so while interpreting a *statute's* wrongful discharge provision, not Maryland common law. 994 A.2d at 978–84. Indeed, the *Lark* Court expressly stated that the case "present us with two questions of *statutory interpretation*." *Id*. at 969 (emphasis added). And the court's relevant holding is "the report of unlawful acts to an external board is not a condition precedent to a civil action *under the Act*." *Id*. at 970 (emphasis added). Finally, though the plaintiff in *Lark* had alleged a common law wrongful discharge claim in the lower court, that claim was dismissed; and though the plaintiff also briefed the issue for the Court of Appeals, it was merely as a request to "create a new public policy exception to Maryland's at-will employment doctrine," which both the lower court and Court of Appeals declined to do. 994 A.2d at 970. The Court will thus follow the Maryland

Court of Appeals's lead and decline Dr. Lurie's invitation to "create a public policy" for the State of Maryland. Mot. to Alter or Amend J. 9. Nor will the Court expand the Maryland public policies embodied in other statutes that Dr. Lurie previously cited.[4]

### 2. Not Otherwise Vindicated by Civil Remedy

Even if *Lark* identified a preexisting, unambiguous announcement of Maryland public policy that fit Dr. Lurie's conduct and discharge, the only source of policy discussed in *Lark* is the Health Care Worker Whistleblower Protection Act, which provides its own civil remedy. Maryland's common law wrongful discharge claim is reserved to vindicate public policies that are not protected by other causes of action. 561 A.2d at 180. In this case, the Health Care Worker Whistleblower Protection Act clearly declares: "Any employee who is subject to a personnel action in violation of § 1-502 of this subtitle may institute a civil action." Md. Code Ann., Health Occ. § 1-504(a). There is thus no basis to support a common law claim for the same wrong.

In sum, despite *Lark*, Dr. Lurie has failed to produce any clear mandate of public policy not otherwise vindicated by a civil remedy that supports his claim; thus, even if Maryland law did apply, *Lark* would not rehabilitate this failure.

### C. New Statutory Claim under the Health Care Worker Whistleblower Protection Act

The decision in *Lark* does not justify allowing Dr. Lurie to use his Rule 59(e) motion to bring a new, statutory, wrongful discharge claim under the Health Care Worker Whistleblower Protection Act. Rather than point the Court to an applicable source of public policy to support his claim, Dr. Lurie urges the Court to consider a new claim under Section 1-504(a) of the Health

---

[4] In his Opposition to Defendant's Motion for Summary Judgment, Dr. Lurie pointed to several other Maryland statutes purportedly announcing public policies that supported his common law wrongful discharge claim. This Court already held that the relationships between those public policies and Dr. Lurie's conduct were "too attenuated to meet the stringent standard for recognizing public policy exceptions to the at-will employment doctrine." 729 F. Supp. 2d at 327. This Court will not revisit that decision without any intervening controlling law.

13

Care Worker Whistleblower Protection Act—despite never having invoked the Act before—because *Lark* is a change in the Maryland common law interpreting the Act. Reply Opp'n Mot. Alter or Amend. J. 2, Sept. 30, 2010, ECF No. 92. The Act was enacted in 2002, so it was available when Dr. Lurie sued in 2006, although he did not then invoke it. Unfortunately for Dr. Lurie, "Rule 59(e) motions are aimed at reconsideration, not initial consideration." *District of Columbia v. Doe*, 611 F.3d 888, 898 (D.C. Cir. 2010) (quoting *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477 (6th Cir. 2007)). The Court will not hear Dr. Lurie's new statutory claim for the first time via a Rule 59(e) motion.

Dr. Lurie warns that the public interest would be frustrated if health care providers are free to discipline doctors without legal consequences for raising quality of care issues. This simply isn't the case here. Under Maryland law, the Maryland Health Care Worker Whistleblower Protection Act is available, and Dr. Lurie simply failed to raise that claim when he should have. And whether D.C. offers similar statutory protection is an issue for the D.C. legislature. The Court will not take it upon itself to fashion its own remedy.

## V. CONCLUSION

For the reasons stated herein, the Court will DENY plaintiff's Motion to Alter or Amend Judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 31, 2011.